## MARTIN v. HICKENLOOPER et al.

No. 5424. Decided August 4, 1936. (59 P. [2d] 1139.)

*Vernon Snyder* and *Herbert Van Dam, Jr.*, both of Salt Lake City, for appellants.

*Irvine, Skeen & Thurman* and *A. R. Barnes*, all of Salt Lake City, for respondents.

WOLFE, Justice.

This case was formerly decided in favor of appellant Martin [*Martin* v. *Hickenlooper*, 90 Utah 130, 40 P. (2d) 213], and a rehearing granted September 27, 1935. The following opinion and decision is substituted for the former opinion and decision and the latter recalled:

The appeal was by Martin from a decree giving Mrs. Zorn priority of mortgage lien over his mortgage by virtue of the principle of subrogation. On February 1, 1921, while C. H. Stoven was owner of the property, he, together with Florence M. Stoven, his wife, executed a mortgage for $3,500 in favor of the state of Utah. On June 18, 1921, the Stovens conveyed the mortgaged property to Clara C. Hickenlooper subject to the mortgage together with certain shares of water in two irrigation companies. Two days later, on June 20, 1921, Clara C. and W. A. Hickenlooper, her husband, mortgaged the premises to Martin to secure two notes of even date aggregating $2,500. Thereafter, on February 24, 1922, the Hickenloopers conveyed, subject to the two above-specified mortgages, to the Fritsch Loan & Trust Company together with "any and all water rights used in conection with" the premises. On June 1, 1927, the Fritsch Loan & Trust Company delivered to Mrs. Zorn a mortgage together with the water shares to secure its note of $3,500. This mortgage did not specify that it was subject to any other mortgage. The state's mortgage was released on the same day, to wit, June 1, 1927, by reason of the money advanced by Mrs. Zorn. On June 1st an abstract was furnished to Mrs. Zorn, certified to January 12, 1927; the $1,000

note payable to Martin had been paid, but the $1,500 note together with back interest remained unpaid. Martin brought this action to foreclose, joining Mrs. Zorn among others. She cross-complained and answered. As to Martin she claimed priority on the ground that her money was used to pay off the state's note, was intended for that purpose, and that the Fritsch Loan & Trust Company, by one Penner, its general manager and secretary, agreed that her mortgage was to be a first lien and that he made representations that it was such. Mrs. Zorn had no knowledge that Martin had a mortgage on the property until he brought suit. She never received a release of the state's mortgage nor any of the canceled papers relating to the state's mortgage. She never examined, or caused to be examined, either the abstract or the record. The evidence is that she trusted Penner and that he said she did not need a lawyer; that he would have his lawyer look it over. Other facts, if necessary to an understanding of the principles to be proponded, will be given later.

The trial court found that the Fritsch Loan & Trust Company had made the representations and promises as above set out, and decreed the Zorn mortgage as prior to the Martin mortgage on the theory that the former stood in equity in place of the state's mortgage, and gave a personal judgment against the Stovens in favor of Zorn. Practically all of the assignments go to alleged error of the court in applying the principle of subrogation. Such assignments as specified error in the admission of evidence are not well taken, as it was necessary to admit such evidence in order to determine whether Mrs. Zorn should be subrogated to the state. Such assignments as specified error in the overruling of demurrers to Mrs. Zorn's cross-complaint and to the refusal to strike certain paragraphs in the complaint are likewise not well taken, for the reason that the matters alleged therein were necessary to present respondent's theory of subrogation and, therefore, necessary to constitute an answer to the complaint and were not irrelevant or immaterial. This

leaves only the question of whether, under the facts of the case, the court properly applied the equitable doctrine of subrogation.

Owing to the fact that there appears to be a formidable array of confusion in the cases which we shall later consider as to what is required for subrogation in the case where one loans money to pay off the mortgage or lien of another, we deem it helpful to preface such consideration by a statement of the principles which govern subrogation generally. In the first place, it is a purely equitable doctrine borrowed from the civil law. It was first applied only in the case of sureties. As stated in the case of *Beaver County* v. *Home Indemnity Co.*, 88 Utah 1, 52 P. (2d) 435, equity first applied the doctrine strictly and sparingly. It was later liberalized and its development was the natural consequence of a call for the application of justice and equity to particular situations. It became recognized as a wholesome and highly meritorious doctrine and is now highly favored in equity. *Bingham* v. *Walker Bros., Bankers*, 75 Utah 149, 283 P. 1055, 1063. Says the court in *Kent* v. *Bailey*, 181 Iowa 489, 164 N. W. 852, 853:

"The books agree that subrogation is not founded on contract or privity or strict suretyship, but is born of equity, and results from the natural justice of placing the burden where it ought to rest. The remedy depends upon the principles of justice, equity, and benevolence to be applied to the facts of the particular case. It is of equitable origin, adopted to compel the ultimate discharge of a debt or obligation by him who in good conscience ought to pay it. These principles will be found well stated in the text-books on the subject and repeated in the almost innumerable decisions. See valuable note in which the cases are collected to *American Bonding Co.* v. *Nat. Mech. Bank*, 97 Md. 598, 55 A. 395, 99 Am. St. Rep. 466. The authorities are also agreed that the doctrine since first recognized has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons. *Home Sav. Bank* v. *Bierstadt* [168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146], supra; *Heuser* v. *Sharman* [89 Iowa 355, 56 N. W. 525, 48 Am. St. Rep. 390], supra. The remedy is to be administered according to the established rules of equity jurisprudence."

In *South Omaha Nat. Bank* v. *Wright,* 45 Neb. 23, 63 N. W. 126, in the syllabus (by the court) it is stated:

"The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice, and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test in all cases for its application. Whether the doctrine is applicable to any particular case depends upon the peculiar facts and circumstances of such case."

In *Home Sav. Bank of Chicago* v. *Bierstadt,* 168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146, it was stated:

"While these general heads include the doctrine and principles of subrogation, that doctrine has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons. This equitable principle is enforced solely for the accomplishment of substantial justice where one has an equity to invoke which cannot injure an innocent person."

In *Emmert* v. *Thompson,* 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566, decided in 1892, it was stated:

"It has been well said that the doctrine of subrogation has been steadily growing and expanding in importance, and becoming more general in its application to various subjects and classes of persons. It is not founded upon contract, but is the creation of equity,—is enforced solely for accomplishing the ends of substantial justice; and, being administered upon equitable principles, it is only when an applicant has an equity to invoke, and where innocent persons will not be injured, that a court can interfere."

The assertion that subrogation is a growing and expanding doctrine applied to fit the particular facts of any case in order to work out an equitable and just result is amply borne out by a comparison of many of the cases decided before 1900 as compared with the more recent cases. Yet courts have striven to lay down rules of guidance to govern courts of equity in applying the doctrine, but these rules are largely a codification of principles stated in the cases and have themselves changed as the courts applied the doctrine to new sets of facts and gave it broader interpretation.

In pursuance of this effort to formulate rules, it is said that subrogation is of two kinds, "legal" and "conventional." In *Bingham* v. *Walker Bros., Bankers, supra,* it is stated:

"**Legal** subrogation" arises "where the person who pays the debt of another stands in the situation of a surety or is compelled to pay to protect his own right or property."

In passing, it may be said that the compulsion meant is not just one to prevent foreclosure, but extends to the case where the payor or his property are obligated and the creditor has the right to pursue them. The payment does not need to be made because of a present pressure by the creditor or present danger of loss. States the Bingham case further:

" 'Conventional subrogation,' occurs where one who is under no obligation to make payment, and who has no right or interest to protect, pays the debt of another under an agreement, express or implied, that he will be subrogated to the rights of original creditor."

These definitions have been repeated in substance and effect, but with varying words, in many cases and textbooks. 25 R.C.L. 1316, 1317, and pp. 1337-1342; *Home Sav. Bank of Chicago* v. *Bierstadt, supra; Wilkins* v. *Gibson,* 113 Ga. 31, 38 S. E. 374, 84 Am. St. Rep. 204; *Crippen* v. *Chappel,* 35 Kan. 495, 11 P. 453, 57 Am. Rep. 187; *Kent* v. *Bailey,* supra; *Rice* v. *Winters* (1895) 45 Neb. 517, 63 N. W. 830; *Washburn* v. *Osgood,* 38 Neb. 804, 57 N. W. 529; *Wallace* v. *Benner,* 200 N. C. 124, 156 S. E. 795. In *Aetna Life Ins. Co.* v. *Middleport* (1888) 124 U. S. 534, 8 S. Ct. 625, 630, 31 L. Ed. 537, it was said, quoting from *Shinn* v. *Budd,* 14 N. J. Eq. 234:

" 'Subrogation as a matter of right, as it exists in the civil law, from which the term has been borrowed and adopted in our own, is never applied in aid of a mere volunteer. Legal substitution into the rights of a creditor, for the benefit of a third person, takes place only for his benefit who, being himself a creditor, satisfies the lien of a prior creditor, or for the benefit of a purchaser who extinguishes the encumbrances upon his estate, or of a co-obligor or surety who discharges the debt, or of an heir who pays the debts of the succession.' " *Louisville Joint Stock Land Bank* v. *Bank of Pembroke,* 225 Ky. 375, 9 S. W. (2d) 113.

In *Guy* v. *Du Uprey*, 16 Cal. 195, at page 198, 76 Am.
Dec. 518, it is stated:

"There are, says Bouvier, three kinds of subrogation. The first, is
where the owner of a thing voluntarily assigns it. The second, is
where a man pays a debt which cannot properly be called his own, *but
which it is his interest to pay*, or which he might be compelled to pay
for another. The third, is where the debtor borrows money expressly
to pay off his debts, and with the intention of substituting the lender
in the place of the original creditor." (Italics supplied.)

But back of legal and conventional subrogation are prin-
ciples more nearly ultimate. The first is founded on the
principle that one cannot enrich himself at the expense of
another by getting free of a debt by letting another, not so
fundamentally or primarily bound, pay it. As stated in
the Beaver County Case, supra, it is a matter of compara-
tive equities. Where one is more fundamentally or primar-
ily liable for a debt which another is compelled or obligated
to pay, or the equities lean more toward his paying it than
they do toward the other paying it, such person shall not
enrich himself by escaping his obligation. If both are equal-
ly liable, contribution but not subrogation may be applicable.
In the case of *conventional* subrogation, equity says: Where
the lender of money did it with the intention and under-
standing that he was to be placed in the position of the
creditor whose debt he paid, but without taking an assign-
ment of the credit, equity, where no innocent parties will
suffer or no right has intervened, will treat the matter as
if an assignment had been executed. That is the reason why
Mr. Rawle, in his edition of Bouvier, included assignments
as a third type of subrogation. We shall later have occasion
to apply these principles to the instant case after an analysis
of the cases, and to see how the recording statutes and care-
lessness in failing adequately to search the records affect
their application.

We shall now consider a number of cases where one not
obliged to pay or liable for a secured debt nevertheless did so
in ignorance of subsequent liens or on the wrong supposition

that the instrument purporting to secure his debt was valid. It should be generally noted that in some of these cases the ignorance was due to the fraud of the mortgagor or debtor; in others to honest mistake which was of two kinds, i. e., first, mistake as to the legal effect of some instrument, or second, mistake of fact as to the existence of subsequent liens. And in the cases where there was this ignorance of other liens, the cases might again be subdivided into those where it was due *only* to a failure adequately to search the record or carelessness and those where the failure to search was induced by assurances or misrepresentations, intentional or otherwise, of the debtor. They may again be subdivided into those where there was an express agreement to give the lender a first lien and those in which it was merely understood that he was to have it, inferable from the situation itself or from conversations (implied agreement) ; and those in which it was said that it was intended that the lender should be put in the place of the lien creditor whose debt he paid. The reader will, in case he has occasion so to do, do his own classification along one or more of the lines above indicated as necessity demands. Within the scope of this opinion only the more general classifications can be made. Since appellant claims that respondent was in this case guilty of such negligence in failing to have the abstract or record examined as would cause equity to refrain from giving her the advantage of subrogation, we shall pay marked attention to the effect the courts have given to that matter. Furthermore, since appellant contends there is not present such an agreement, express or implied, to subrogate Mrs. Zorn to the state's lien under the principle of conventional subrogation, we shall pay particular attention to that phase. Naturally, under the definition of "legal subrogation" above given, there is no room for the application of that type of subrogation. Mrs. Zorn was utterly unrelated to the property either as owner or lienholder when she advanced the money to pay off the state's mortgage. It should, furthermore, be noted that in some of the cases considered

and in many others which might be examined, there is a situation in which legal and conventional subrogation appear to come together. These are the cases where the party claiming subrogation is not really a lender, but by agreement with the debtor mortgagor buys the property and pays off a lien on assurances that there are no subsequent liens. In the sense that the property he purchases is obligated for the mortgage debt, even if he does not assume it personally, his payment might be the basis of a legal subrogation, granted the facts making that doctrine apply are present. In the sense that he had an understanding with the debtor that there were no subsequent liens and that his paying off a first lien would discharge all liens, he has the basis for conventional subrogation as well as the application of the equitable severance of title and mortgage when by subrogation the creditor's mortgage would in equity be considered as if assigned to the purchaser of the fee and thus both in equity reside in the same person. There is much confusion in the reasoning of the cases as far as stating a definite basis for allowing subrogation. This is for the simple reason that the courts saw, through the minds of the chancellors who sat upon them, situations which they thought called for equitable relief without stating in clearcut fashion the real basis for it—thus further illustrating that the application of the doctrine of subrogation is one depending primarily upon the inherent justice or equity of each particular case. It may also be remarked that while many of the decisions do homage to the requirement of an express or implied contract for subrogation as the basis of their decisions, it requires a very great stretching of the facts to find either. Some of the cases very boldly state that an intention that the lender shall be subrogated or that if it was "understood" (not an understanding in the nature of a contract) that he should be, it will be sufficient. Especially is this true of the more recent cases, some of which appear to go baldly on the statement that where a subsequent lienholder is not prejudiced by the lender's failure to look up

the record and that he will be exactly in the same position he thought he was and intended to be, he cannot complain if equity treats the situation as if an assignment of the prior lien had been made to the lender. Others, putting it in a slightly different way, say only gross and culpable negligence will prevent the lender from stepping into the place of the prior secured creditor because subsequent lienholders should not be permitted to gain by another's mishap or carelessness when thus gaining would be purely fortuitous and accidental. It should also be marked that the part which constructive notice to the lender, as given by the record, plays in the matter, varies with the cases. Some decisions distinctly hold that the record imports constructive knowledge to the lender of subsequent liens properly recorded, but that constructive knowledge forms no barrier to the application of subrogation. Other cases hold that the doctrine of constructive knowledge is not applicable because such notice was for the purpose of protecting subsequent lienholders or purchasers from buying or lending as against existing prior interests or liens but not for the purpose of permitting one who already had his lien to advance it because of the inadvertent release of a prior lien by reason of the payment of the debt by a lender who intended or understood that he was to be substituted for such prior lienholder. It does not appear to us important from the standpoint of subrogation to fasten on one view or the other. If it is true that negligence in searching the record or lack of due care is not a hindrance to subrogation, the doctrine of constructive notice would seem to be quite immaterial. The matter of negligence and the effect of constructive notice are somewhat tied up together in this sort of subrogation. It may be puzzling to understand why in cases of conventional subrogation carelessness has any part whatsoever. If subrogation depends upon an implied or express agreement to subrogate, what boots it whether or no the lender had notice of subsequent liens? He may be quite cognizant of the whole record, and yet if his right to

be substituted for another depends upon an agreement to subrogate—which in equity is to be treated, upon his lending the money, as if an assignment of the creditor's lien had been made to him—his failure to look up the record would be no more material than if he had actually taken an assignment. The answer lies in the fact that even when there is an agreement to subrogate, the so-called right of subrogation is not one inherent in the contract, but arises in equity and can therefore be withheld or applied as in equity seems meet according to sound judicial discretion, which is another way of saying, according to the dictates of justice. The doctrine of subrogation has its roots in the soil of justice and equity, and not in contract, and thus it is said that only inexcusable or unjustifiable or culpable negligence will bar the application of the doctrine. But a reading of the cases will make one suspect that most of the courts have rather confused legal with conventional subrogation. In the former case, inexcusable or culpable negligence may restrain the arm of equity.

With the above observations in mind we shall be in better position to appreciate the cases. It will be seen that the more recent cases show a very decided liberality over the stricter cases of a generation ago.

As to the part negligence plays in preventing the application of the doctrine: In *Mather* v. *Jenswold* (1887) 72 Iowa 550, 32 N. W. 512, 513, it was stated:

"The only question in the case is whether the plaintiff is entitled to have the satisfaction of the Simmons mortgage set aside, and that he be subrogated to all the rights of Simmons. It seems to us that he is not entitled to such relief. The plaintiff made the loan to Lord for the express purpose of paying the Simmons mortgage, and it was well understood that the plaintiff was to accept a new mortgage. The plaintiff got all he bargained for. There was no mistake, except that the plaintiff failed to exercise the diligence required in the examination of the records, and therefore failed to discover the existence of the judgment and sale thereunder. No one can be blamed, but he must suffer loss simply because he was negligent."

The case of *Ft. Dodge Bldg. & Loan Ass'n* v. *Scott* (1892)

86 Iowa 431, 53 N. W. 283, follows the Mather case, holding that the negligence in failing to examine the record will work a denial of the application of subrogation. In *Rice* v. *Winters* (1895) 45 Neb. 517, 63 N. W. 830, 834, it was stated:

"But the mistake of Rice, whether of law or fact, was the result of his own negligence. He was bound to know the law, and if the record showed that the Grommes & Ullrich mortgage had been released by Jones, he was bound to know whether Jones had authority to execute that release. If the abstract had recited that the Grommes & Ullrich mortgage had been released, and it had turned out that in fact no release had ever been made, or attempted to be made, then he would have acted under a mistake of fact; but, if he suffered an injury from acting on such mistake, the injury would have still been the result of his own negligence. An intending purchaser or mortgagee of real estate relies and acts upon the recitals of an abstract made of the title to such real estate at his peril."

The later Nebraska cases have taken a more liberal view. In fact, Nebraska seems to have had great difficulty with the question and presents a good illustration of vacillation over and development of the doctrine.

In *Hayden* v. *Huff* (1900) 60 Neb. 625, 83 N. W. 920, it was held that:

"Subrogation is enforced to subserve the ends of justice, but will not be applied when it will wrong an innocent party, and where the one invoking the doctrine has been grossly negligent."

This case shows a softening of the previously strict holdings of the Nebraska courts. In this case the only fact which appeared to prevent the application of the doctrine was that Alice A. Munich purchased the property only in *reliance upon* the release and discharge of the mortgage and not upon reliance of an agreement. The court adds that *gross* negligence will prevent application of the doctrine and evidently holds a failure to examine the record as such negligence.

In *Farrell* v. *Bouck* (1990) 60 Neb. 771, 84 N. W. 260, it was held:

"A mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake.

"One who fails, through culpable inertness, to make inquiry when it is his duty to inquire, and by reason of such failure loses a valuable right, is not entitled to relief in equity on the ground of mistake."

In the case of *Frederick* v. *Gehling* (1912) 92 Neb. 204, 137 N. W. 998, 999, we have, after much struggle and travail, the first definite turning of the Nebraska court to the modern view. The court said:

"It must be conceded that, in view of the very many decisions of this court in regard to the right of subrogation, this question is not free from difficulty."

In this case the lender failed to discover a judgment lien against the mortgage but paid the mortgagee, expecting and intending to get a first lien and to be exactly in his place. The court allowed subrogation. It was followed in *Prudential Ins. Co. of America* v. *Qualset* (1928) 116 Neb. 706, 218 N. W. 734, 735, and in *Hoagland & Co.* v. *Decker* (1929) 118 Neb. 194, 224 N. W. 14, where is was held that:

"No general rule can be laid down which will afford a test in all cases for conventional subrogation. Whether or not the doctrine of conventional subrogation is applicable in any particular case depends upon its particular facts and circumstances, the principle not being enforced as a matter of legal right, but in order to subserve the ends of justice in the particular controversy under consideration."

In *Heisler* v. *C. Aultman & Co.* (1894) 56 Minn. 454, 57 N. W. 1053, 45 Am. St. Rep. 486, it was stated:

"That in this way a court, under a great variety of circumstances, may relieve one who has acted under a justifiable or excusable mistake of fact, is well settled, and that it is a common thing for courts of equity to relieve parties who by mistake have discharged mortgages of record, and to fully protect them from the consequences of their acts, where, as before stated, no injury to innocent parties will result."

This case, as some of the others, seemingly grants the relief partly on the ground of relieving one from the consequences of a mistake of fact, where no other party's rights are prejudiced by such relief; the mistake being to release a lien upon the mistaken belief that there were no subsequent liens to advance before the lender's lien would be substituted for

the released lien. See *Emmert* v. *Thompson* (1892) 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566, supra.

In *Straman* v. *Rechtine* (1898) 58 Ohio St. 443, 51 N. E. 44, it was stated:

"Where money is loaned under an agreement that it shall be used in the payment of a lien on real estate, and it is so used, and the agreement is that the one who so loans the money shall have a first mortgage lien on the same lands to secure his money, and through some defect in the new mortgage, or oversight as to other liens, the money cannot be made [sic] on the last mortgage, the mortgagee has a right to be subrogated to the lien which was paid by the money so by him loaned, when it can be done without placing greater burdens upon the intervening lienholders than they would have borne if the old mortgage had not been released, but not as against a bona fide lienholder who acquired his lien after the release of the old mortgage, without notice of such agreement and payment."

*Miller* v. *Scott* (1924) 23 Ohio App. 50, 154 N. E. 358, 359, followed the Straman case above, quoting from 25 R. C. L. 1393, § 76, as follows:

" 'Subrogation is founded on the principles of equity and benevolence, and is not to be allowed in favor of one who has permitted the equity he asserts to sleep in secrecy until the rights of others would be injuriously affected by its assertion and enforcement. * * * However, subrogation is often allowed notwithstanding there is more or less negligence, and it may be said that negligence which does not increase the burdens of any lienholder does not prevent subrogation or bar the right thereto.' "

Here there was a suit begun against the owner of the land at the time the lender paid off a lien, which suit ripened into a judgment. Under the Ohio law the judgment related back to the first day of the term which was before the lender's mortgage was executed. The negligence in failing to discover pending suits was no bar to imposing the doctrine.

In *Home Sav. Bank of Chicago* v. *Bierstadt* (1897) 168 Ill. 618, 48 N. E. 161, 162, 61 Am. St. Rep. 146, it was stated:

"This principle [subrogation] will be applied even where the record shows a release of the satisfied incumbrance, as the lien so satisfied

will be removed for the benefit of the party satisfying the same, where there has not been gross negligence, and where justice requires it should be done; and this will be done as against a subsequent incumbrancer, whose incumbrance has not been taken or his position changed because of the record showing the discharge of the senior incumbrance."

In this case the abstract failed to show the subsequent deed of trust, although it was on record.

Other cases holding that failure to look up the record will not prevent the application of the doctrine are as follows: *Seeley* v. *Bacon* (N. J. Ch. 1896) 34 A. 139; *Jackson Trust Co.* v. *Gilkinson* (1929) 105 N. J. Eq. 116, 147 A. 113. In the case of *Sumner* v. *Seaton* (1890) 47 N. J. Eq. 103, 19 A. 884, 887, it was said:

"Courts of equity have in many cases given parties the benefit of an honest supposition as to title, where the slightest examination of the record or other equally available source of information would have disclosed their error."

In *Nelson* v. *McKee* (1912) 53 Ind. App. 344, 99 N. E. 447, 450, 101 N. E. 651, illustrating seemingly a belated revival of the older and stricter rule, it was stated:

"The proposition mainly relied upon to support the claim to the right of subrogation is that the holder of the judgment lien is not harmed thereby. This is true, but, on the other hand, his judgment was of record, and a person taking a new mortgage and knowing that the existing mortgage was to be paid and satisfied is charged with notice of the fact that judgment and other liens may have attached to the property after the execution of the mortgage which was to be satisfied. The law compels knowledge of the fact that an outstanding judgment junior to an existing mortgage will become a first lien upon satisfaction of the mortgage and thus determines appellant's right to hold his senior lien, and, if he can be deprived of such right, it must be by virtue of some superior equity. * * * There was no express agreement that the old security should be kept alive for his benefit, and we cannot imply such an agreement when he voluntarily elected to take a new mortgage and knew the old one was to be satisfied. He saw fit to secure his loan by a new mortgage, and got what he demanded. True, he believed he was obtaining a first lien upon the real estate, but this belief was not induced by any fraud or misrepresentation. If he did not get all he thought he was obtaining it was due to

his own negligence in failing to ascertain the existence of other liens upon the property covered by his mortgage. When we balance equities the facts of this case show no superior equities in favor of the mortgagee as against appellant's rights. The mortgagee was a stranger to the transaction until he made the loan, and his belief, under such circumstances, that he was obtaining a first mortgage, was only possible because of his own negligence. He failed to take the necessary precautions and employ the ordinary means to ascertain the character and value of his security. The mere fact that his money was loaned to pay an existing mortgage, and the further fact that subrogation would not place appellant in a worse situation than he was in before the satisfaction of the bank's mortgage, are not sufficient to overcome his voluntary act in loaning the money, demanding and receiving a new mortgage, knowing the old one was to be released, and his negligence in failing to ascertain the existence of liens against the mortgaged property."

This case holds that it takes more than a mere intention to be subrogated. It apparently holds that negligence will defeat the application of the doctrine, but may have been decided on the point that there was no express or implied contract and, therefore, no case of conventional or legal subrogation was presented since the lender was not compelled to pay to protect himself and had no previous relation to the property.

In *Hargis* v. *Robinson* (1901) 63 Kan. 686, 66 P. 988, it was stated:

"There was no direct assumption of liens by Robinson and Read, but they are deemed to have taken it subject to valid liens that are of record, and they cannot plead ignorance of liens which an examination of the records would have revealed. Ordinary care required an examination of the records; and where persons neglect to avail themselves of the appointed means of information they are not in a good position to appeal for equitable relief, as equity does not encourage or reward negligence."

In *Woodside* v. *Lippold* (1901) 113 Ga. 877, 39 S. E. 400, 402, 84 Am. St. Rep. 267, it was stated:

"While equity will grant relief against a mistake of fact, it is well established that such a mistake must be of such a nature that it could not, by reasonable diligence, have been avoided at the time. Equity will not relieve against the results of culpable and inexcusable negli-

gence. By the exercise of the slightest diligence on the part of Woodside and the banking company, they could have readily ascertained the intention of Lippold in reference to the enforcement of his mortgage. It does not appear that he or his attorney ever intimated that the mortgage had been abandoned. The attorney for the banking company gave as a reason for the satisfaction and cancellation of the company's mortgages that the attorney for Woodside reported that he had had an interview with the attorney for Lippold, and that Lippold would not enforce his mortgage. Equity will not grant relief under such circumstances."

It will be noted that the court spoke of culpable and inexcusable negligence. In this case there was actual knowledge of the subsequent lien, but a supposition, which by the merest inquiry could have been reduced to a certainty, that such lienholder would not assert it against the lender. The case is given to show what sort of negligence courts will not relieve against in any event.

In *Bormann* v. *Hatfield* (1917) 96 Wash. 270, 164 P. 921, 922, L. R. A. 1917 E, 1052, the statement of the court would fit the facts of the instant case quite aptly. The court said:

"Counsel for the defendant Hatfield insist that, according to plaintiff's testimony, he released his first mortgage of record without examining the public records for the purpose of ascertaining whether there were any intervening liens upon the property, and that equity will not relieve him on the ground of ignorance of facts which he could have ascertained by the exercise of reasonable diligence. This contention ignores the fact that it is established by the clear preponderance of the evidence that the defendant Alfred J. Vyverberg represented to both plaintiff and his counsel, at the time the release was executed and the new mortgage was accepted, that there were no other liens or incumbrances upon the property. This assurance was reasonably calculated to disarm vigilance on the part of the plaintiff and to induce him not to examine the records. We are also unable to see how Hatfield's rights or interests were in any way affected by failure of the plaintiff to examine the records."

In *Kent* v. *Bailey* (1917) 181 Iowa, 489, 164 N. W. 852, at page 855, it was stated:

"But equity will not rectify a mistake due to inexcusable negligence. *Ft. Dodge B. & L. Ass'n* v. *Scott*, 86 Iowa 431, 53 N. W. 283. There reliance on an abstract not brought up to date was adjudged negli-

gence. The degree of diligence exacted necessarily depends upon the facts of each case. Where the act done by mistake is one calculated to induce others to pursue a lien of conduct which will put them to loss if the mistake be corrected, it should be clear that the party asking for relief has been led into the mistake in spite of the exercise of that high degree of care exacted under such circumstances. But where no one is injured by the mistake other than the party himself, and no one has changed his position, in consequence of what has been done and of the mistake, no tenable reason appears for denying a correction of such mistake, even though a high degree of care has not been exercised."

In *Owen* v. *Interstate Mtg. Trust Co.* (1922) 88 Okl. 10, 211 P. 87, 89, 30 A. L. R. 816, it was stated:

"In the case at bar the defendant in error executed its mortgage without making any examination of the record whatever. If it had examined the record at all, it is highly probable that it would have discovered that an execution or an order of sale had been issued, and this no doubt would have led them to have examined the return of the sheriff in order to learn what had become of the order of sale."

In this case subrogation was not permitted, but whether because of indiligence or because of the lack of implied contract is not clear. The applicant for subrogation was held a mere volunteer. See infra.

In *Hill* v. *Ritchie* (1916) 90 Vt. 318, 98 A. 497, at page 498, L. R. A. 1917 A, 731, it was stated:

"The chancellor has found, and has apparently turned the case upon, the facts that the Ritchie mortgage was properly recorded, and that the plaintiff could readily have learned from the records that such a mortgage had been given. The doctrine of constructive notice is not applicable; and we think the findings regarding the record do not constitute a defense. An examination of the records would have disclosed the incumbrance, but the question is whether an examination was required by the rule of diligence applicable to the case. This is not a case where the relief of the plaintiff will cause an actual loss to the defendant. Ritchie has not increased his investment since the payment of the lien note, and a reinstatement of the security will simply leave him in his original position. He will lose nothing but the gain which would otherwise have accrued to him from the plaintiff's mistake. Nothing short of very culpable negligence will bar relief in these circumstances. Parties who have paid prior liens at

the request of the debtor in ignorance of the existence of subsequent incumbrances have been held entitled to the remedy of subrogation, notwithstanding a failure to examine the records."

In *Louisville Joint Stock Land Bank* v. *Bank of Pembroke* (1928) 225 Ky. 375, 9 S. W. (2d) 113, 115, it was stated, in discussing the matter of constructive knowledge:

"But it is argued that the mortgage of appellee was on record and the appellant, being charged with knowledge thereof, could not by reason of its negligence claim subrogation. We have held, however, that the maxim, 'The laws assist those who are vigilant, not those who sleep upon their rights,' does not apply to a case of this kind as any apparent advantage which appellee may have is the result not of its vigilance, but of a mistake on the part of appellant, and a false statement by the mortgagor. *Farmers' & Drovers' Ins. Co.* v. *German Insurance Co.*, 79 Ky. 598.

"The negligence of the abstractor did not injure the appellee. It did nothing or paid nothing in reliance on the mistake."

In *Federal Land Bank of Springfield* v. *Smith* (1930) 129 Me. 233, 151 A. 420, 422, it is stated:

"The weight of authority is that, in the absence of some prejudice resulting to the junior lienor from the change of owners of the senior lien, the record lien will not defeat the rights of subrogation, even though there was constructive notice from the record, and there is no evidence or claim that the plaintiff in the case now under consideration had any actual knowledge of the Weeks mortgage."

This case quotes the language above quoted from *Hill* v. *Ritchie* and cites an additional group of cases besides those cited in the Hill case, all of which are considered hereunder. The case also quotes with approval the language herein quoted from the case of *Louisville Joint Stock Land Bank* v. *Bank of Pembroke,* supra.

In *Hughes Co.* v. *Callahan* (1930) 181 Ark. 733, 27 S. W. (2d) 509, 510, it was stated:

"It is true that he might have discovered appellant's execution deed by examination of the record, but he was not culpably negligent in failing to do so on account of the assurances given by the mortgagor, and, if it had been discovered, his rights could have been protected as completely in making the loan as was intended should be done by requir-

ing the transfer or assignment by the mortgagor to him upon his payment of the mortgage debt upon the request of the mortgagor."

The above excerpts will suffice to give an idea of the extent and type of carelessness which was urged as a reason for not applying the doctrine and how the courts viewed the effect of such inertness.

In *Wallace* v. *Benner* (1931) 200 N. C. 124, 156 S. E. 795, the Joint Stock Land Bank sent its check to its attorney with instructions to see that before the money was to be paid over, he should see that the bank obtained a first lien. The attorney paid the money to the first mortgagee without obtaining a release of either his or the second mortgagee's mortgage, contrary to the Federal Farm Loan Act (12 U. S. C. A. § 641 et seq.). It was held that the bank should be subrogated to the lien of the first mortgagee. The court stated that the bank did not come within any of the three exceptions which would bar the application of the doctrine, to wit: (1) A mere volunteer. (2) Where the party claiming relief is guilty of culpable negligence. (3) Where granting relief would operate to the prejudice of a junior lienholder.

Having analyzed the cases for the purpose of determining what effect they give to negligence, better called inertness or indiligence, we turn to a study of what is required in the way of an agreement in order to form the basis of conventional subrogation. Here again we discover an evolution from the earlier cases, some of which required an express agreement up to the very extreme case where not only an implied agreement was sufficient, but the facts from which the agreement was implied were such as would show merely an intention or a purpose that the money was to be applied to pay off and release an existing lien and so understood.

In *Guy* v. *Du Uprey*, 16 Cal. 195, 76 Am. Dec. 518, a very early case, the guardian executed a mortgage, without authority of court, which the court said was therefore invalid. The money advanced for the invalid mortgage paid off a first mortgage. The lender's mortgage being invalid, sub-

sequent liens moved up. The court denied subrogation, stating:

"A mere stranger, who voluntarily pays money due on a mortgage, and fails to take an assignment thereof, but allows it to be canceled and discharged, cannot afterwards come into equity, and, in the absence of fraud, accident or mistake of fact, have the mortgage reinstated and himself substituted in the place of the mortgagee."

A mere comparison between the holding of this case under its facts and those set forth hereunder will show how conventional subrogation has developed.

In *Aetna Life Ins. Co.* v. *Middleport* (1888) 124 U. S. 534, at page 551, 8 S. Ct. 625, 631, 31 L. Ed. 537, the court stated, quoting from *Suppiger* v. *Garrels*, 20 Ill. App. 625, an Illinois appeal case, as follows:

" 'Subrogation in equity is confined to the relation of principal and surety and guarantors; to cases where a person, to protect his own junior lien, is compelled to remove one which is superior; and to cases of insurance. * * * Any one who is under no legal obligation or liability to pay the debt is a stranger, and, if he pays the debt, a mere volunteer.' "

In *Browder & Co.* v. *Hill* (C. C. A. 1905) 136 F. 821, 823, it is stated:

"The mere fact that one pays off a debt at the instance of the debtor, or lends money to pay off such debt, does not entitle him to subrogation to the liens of the creditors so paid off. * * *

"Conventional subrogation may result from a direct agreement between a debtor and a third person who pays the debt that he shall be subrogated to all the rights and securities existing in behalf of the creditor whose debt is paid off. *But nothing short of an express agreement to that effect will move a court of equity in behalf of such a creditor. A mere understanding upon the part of such a third person, under no obligation to pay the debt, that he by such payment will be subrogated to the liens of the creditor, is not enough.*" (Italics supplied.)

In *Lane* v. *Lloyd* (1908) 110 S. W. 401, 402, 33 Ky. Law Rep. 570, we have apparently an extreme case on the side of the appellant. It is stated:

"Conceding the truth of the testimony of J. W. Lane that his brother R. H. Lane told him if he would get the money from Goodpaster for

the purpose of paying off the Beall and Farmers' Bank liens he should be substituted to the liens paid off, this would not avail Goodpaster or J. W. Lane in this case. In the first place the debtor could not give away the rights of the execution lienholders, and in the second a lien upon the real property could not be acquired by this verbal arrangement. In the case of *Reid, etc.*, v. *Jackson*, 6 Ky. Law Rep. 743, it was held that 'one who loans to another money with which to pay off a vendor's lien is not thereby substituted to the rights of the vendor, and does not acquire a lien. Therefore the sureties of the vendee in the note executed for the money borrowed for this purpose do not acquire a lien by substitution to the rights of the obligee, he having none himself. Nor is a mere parol promise by the vendee that they shall have a lien sufficient to create a lien.' "

In *Home Sav. Bank of Chicago* v. *Bierstadt* (1897) 168 Ill. 618, 48 N. E. 161, 163, 61 Am. St. Rep. 146, it was held that the facts showed an agreement so as to raise a conventional subrogation when the lender was to advance sufficient money to discharge other liens and was to receive for the money advanced an equivalent lien. The court said:

"It is the agreement that the security shall be kept alive for the benefit of the person making the payment which causes the right of subrogation to exist, because it takes away the character of a mere volunteer."

The case of *Bohn Sash & Door Co.* v. *Case* (1894) 42 Neb. 281, 60 N. W. 576, recognized the more liberal view taken by the Minnesota court in *Emmert* v. *Thompson* (1892) 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566, quoting the language from that case set out hereunder in this opinion. But *Rice* v. *Winters*, supra (Neb. 1895), held that subrogation would not be granted although the facts were as favorable for it as in many of the other cases cited herein. In the Rice case the lender advanced the money on the agreement of the mortgagor to secure a first mortgage and thought he had one, but the apparent release of the second mortgagee's mortgage was without authority. Under the Bohn decision it would have seemed to be a case for subrogation.

In *Frederick* v. *Gehling* (Neb. 1912) supra, subrogation was allowed under facts which in the earlier cases would

have resulted in a denial. In the case of *Prudential Ins. Co.*
v. *Qualset* (Neb. 1928) supra, we find Nebraska definitely
swinging into line for the more liberal view, saying:

"Indeed, the language of this court in *Meeker* v. *Larsen*, 65 Neb. 158,
90 N. W. 958, 57 L. R. A. 901, with reference to 'an agreement or
understanding that the mortgage is to be kept alive for his benefit,'
is at least an implied recognition of the rule stated in Cyc. in the fol-
lowing form:

" 'And generally, where one pays or advances money to pay a mort-
gage debt with the understanding that he is to have the benefit of the
mortgage, he becomes the holder of the lien by subrogation, although
the creditor is not a party to the agreement.' 37 Cyc. 472."

In *Hoagland & Co.* v. *Decker* (1929) 118 Neb. 194, 224
N. W. 14, the Prudential Ins. Company case, supra, was fol-
lowed. The court stated the modern view very definitely in
the following language:

"No general rule can be laid down which will afford a test in all
cases for conventional subrogation. Whether or not the doctrine of
conventional subrogation is applicable in any particular case depends
upon its particular facts and circumstances, the principle not being
enforced as a matter of legal right, but in order to subserve the ends
of justice in the particular controversy under consideration."

In *Wilton* v. *Mayberry* (1889) 75 Wis. 191, 43 N. W. 901,
6 L. R. A. 61, 17 Am. St. Rep. 193, Wisconsin very early
went on record for the more liberal application of the doc-
trine. But this case could have been decided on the gen-
eral doctrine of granting relief because of fraud. The sub-
sequent grantee took with full knowledge that the lender
had advanced the money to pay off the mortgage lien.

In *Emmert* v. *Thompson* (1892) 49 Minn. 386, 52 N. W.
31, 32, 32 Am. St. Rep. 566, it is stated:

"The better opinion now is that one who loans his money upon real
estate security for the express purpose of taking up and discharging
liens or incumbrances on the same property has thus paid the debt at
the instance, request, and solicitation of the debtor, expecting and
believing, in good faith, that his security will, of record, be substituted,
in fact, in place of that which he discharges, is neither a volunteer,
stranger, nor intermeddler, nor is the debt, lien, or incumbrance re-

garded as extinguished, if justice requires that it should be kept alive for the benefit of the person advancing the money, who thereby becomes the creditor."

To the same effect is *Gore* v. *Brian* (N. J. Ch. 1896) 35 A. 897.

In *Heisler* v. *C. Aultman & Co.* (1894) 56 Minn. 454, 57 N. W. 1053, 45 Am. St. Rep. 486, it was held that when one pays under such circumstances as to raise the presumption that the lender did not intend to extinguish the debt or release the security which was paid or released by the lender's advancements, it will be looked on in equity as if he had purchased the credit together with the security. An equitable assignment would be raised and the release canceled and the lender subrogated. In this case there were no findings as to express intention of the plaintiff when she paid the note, but the court inferred from the circumstances that she intended to have the benefit of the security which secured the debt which was paid by her money.

In *Farm Land Mtg. & Debenture Co.* v. *Elsbree* (1895) 55 Kan. 562, 40 P. 906, 908, it is stated:

"The money was advanced by the company upon the understanding and belief that they had obtained a first lien upon the premises, and was used, as it was intended, for the payment of prior incumbrances. If the company succeeds to the rights of the prior incumbrancers, it will not change the position of the $1,900 mortgage nor depreciate the security of the same. The Elsbrees, if they own the notes and mortgage, could lose nothing by the substitution."

In *Amick* v. *Woodworth* (1898) 58 Ohio St. 86, 50 N. E. 437, the mortgage which was given to secure money advanced to pay off another mortgage was invalid because attested by the grantee. Subsequent mortgages moved up. It was held that the lender whose mortgage was invalid became in equity the assignee of the encumbrances paid out of his money. This is directly contrary to the old case of *Guy* v. *Du Uprey*, supra. Both the Guy and Amick cases could have been placed on the ground of mistake of fact. Both lenders thought their security was good, but were

mistaken as to that fact because of some infirmity in the instrument. Under such circumstances negligence in failing to examine the record would have no part because even in the decisions which hold that the mistake of fact which is urged as a ground for equity intervention must be one not caused by negligence, the courts would not consider a mistake as to the legal effect of an instrument in the same category as failure to examine the record.

In *Hill* v. *Ritchie* (1916) supra, it was stated:

"The facts reported are equivalent to a finding that the plaintiff paid the lien note at the request of Flynn, and upon an understanding with Flynn that he was to have a new security on the property released. So the plaintiff was not an intermeddler or a mere volunteer, and his payment of the first lien did not necessarily give priority to the second. If the payment was made under a material and excusable mistake of fact, and no rights of innocent parties have intervened, the first security will be kept alive as against the holder of the subordinate lien."

In *Bormann* v. *Hatfield* (1917) 96 Wash. 270, 164 P. 921, L. R. A. 1917 E, 1052, it was held (syllabus in 164 P.) :

"When a first mortgagee takes a new mortgage as substitute and releases original mortgage upon mortgagor's misrepresentation that no intervening lien exists, and in ignorance of such lien equity will reinstate the first mortgage lien in its original priority, in the absence of laches or other disqualifying facts, but the holder of the junior incumbrance must not be placed in a worse position than he would have occupied had the senior incumbrance not been released."

The case of *Louisville Joint Stock Land Bank* v. *Bank of Pembroke* (Ky. 1928), supra, quotes the above language with approval. This later Kentucky case must be considered as repudiating the holding of the earlier case of *Lane* v. *Lloyd* (Ky. 1908) supra. Kentucky lines up with the modern view.

The case of *Jackson Trust Co.* v. *Gilkinson* (1929) 105 N. J. Eq. 116, 147 A. 113, 114, founds its decision, to the effect that a payment of a lien debt and the taking of a new mortgage on the honest supposition that the latter would have the same dignity of the lien released, on the following excerpts from 25 R. C. L. 1340, § 24, reading as follows:

" 'The generally accepted view at the present time, however, is that it is not necessary that there should be an express agreement that the prior lien shall be kept alive for the benefit of one advancing money to pay it, or that it be assigned, but if from all the facts and circumstances surrounding the transaction it is clearly to be implied that it was the intention of the parties that the person making the advance was to have security of equal dignity and position with that discharged then equity will so decree. In such cases equity, speaking from the standpoint of good conscience, substitutes the person so paying the debt to the place of the original creditor, so far as to enable him to enforce the security for the purpose of reimbursement.' * * *

" 'There are numerous decisions to the effect that one satisfying an incumbrance at the request of the property owner, upon the understanding that he is to have a first lien upon the property released, acting in ignorance of a junior lien on the property, although it is on record, is entitled to subrogation to the rights of the first lienholder; to substitute one creditor for another would apparently place the junior lienor in no worse position than he was. So it has been held that an agreement for subrogation in favor of one paying a prior mortgage is not necessary to effect such subrogation as against the holder of an inferior judgment lien of the existence of which he is ignorant, if he makes the advance with the understanding that the mortgage shall be satisfied and that he shall have a first lien upon the property.' "

Alabama has accepted the modern view. The court stated in *Shields* v. *Pepper* (1928) 218 Ala. 379, 118 So. 549, 550:

"Under the averments of Pepper's cross-bill, the Whitt-Hall mortgage was outstanding when the lands were purchased by Robison. He acquired only an equity of redemption therein to which the statutory lien attached. Pepper loaned the money to pay this mortgage, and paid it to the holder. Pepper took a mortgage for his loan, and the Whitt-Hall mortgage was satisfied and canceled.

"Under these facts Pepper has a clear right of subrogation, a revival of the equitable lien of the Whitt-Hall mortgage for his protection against the intervening lien created by statute."

The agreement here was implied from the mere fact that "Pepper loaned the money to pay this mortgage and paid it to the holder." All the other southern states whose cases we have examined hold that where the lender pays off the lien under such circumstances as to show that he intended to be secured, as was such paid lienholder, subrogation will

apply. See *Wallace* v. *Benner* (N. C. 1931) supra: *Wilkins* v. *Gibson* (Ga.) supra; and *Woodside* v. *Lippold* (Ga. 1901) supra.

In *Federal Land Bank of Springfield* v. *Smith* (1930) 129 Me. 233, 151 A. 420, 421, it is stated:

"One who, at the request and for the benefit of a mortgagor and on his assurance that there are no other liens or incumbrances against the land and that the loan will be secured by a first mortgage, furnishes the money to pay off the existing mortgage is not a mere volunteer, the loan having been negotiated for the purpose of paying such mortgage, and he is entitled to subrogation to the rights of the mortgagee whose mortgage is thus paid."

In *Hughes Co.* v. *Callahan* (1930) 181 Ark. 733, 27 S. W. (2d) 509, it was held:

"One paying mortgage at mortgagor's request, on assurance payments would be secured by first lien on property, held not 'volunteer' as regards subrogation."

From our study we may draw the following conclusions: (1) That where a lender, in no way related to the property nor in any way required to protect an interest, advanced the money to pay off a lien, it could not be a case for legal subrogation, but must, if anything, come within the principles of conventional subrogation. (2) That in conventional subrogation there must be an agreement, express or implied, that the lender whose money pays off a lien will have the same status as the lien his money releases to the extent of the debt secured by that lien. (3) That equity applies the doctrine of subrogation in such cases, not in exacting a performance of the contract, but as a matter of doing justice under the circumstances; the so-called agreement only being of value showing such a situation where the doctrine should be applied in order to do justice and as evidence that the lender was not a volunteer. (4) That the facts or circumstances from which the agreement will be implied vary in the different courts, some requiring evidence from which an actual understanding between the parties may be inferred, while others hold that payment under such circumstances as show that the lender "supposed" or

"intended" to get security of the same dignity as that released by his payment is sufficient; and some go as far as holding that such intention may be inferred from the mere fact that the money was advanced for the purpose of paying off another lien. (5) That according to the modern view, indiligence in searching the record will not prevent equity from applying the doctrine unless it is culpable or unjustifiable negligence, and that where there is an express agreement to subrogate or one from which such understanding can be plainly implied, and failure to look up the record will not stay the hand of equity for the reason that equity will treat the matter as if there was an assignment which was in effect what the parties intended; that in case of an assignment the record would not need to be searched. (6) That in many of the cases the doctrine of subrogation would not need to have been applied, because there were facts from which equity would have restored the released lien on the ground of mistake, accident, or fraud, but that in the application of such equitable doctrine, the mistake or accident cannot be the result of inexcusable negligence; that it is this rule that where the mistake or accident has been caused by inexcusable neglect or inertness, equity will not be moved to grant relief, which has caused much of the confusion in the cases where conventional subrogation was discussed and denied. (7) That the cases of *Geib* v. *Reynolds*, 35 Minn. 331, 28 N. W. 923, *Emmert* v. *Thompson, Hill* v. *Ritchie, Heisler* v. *C. Aultman & Co., Witton* v. *Mayberry, Bohn Sash & Door Co.* v. *Case*, above cited, and some others, all present facts from which relief on the ground of mistake or fraud could have been granted.

In the light of the review of the above cases and the conclusions reached therefrom, how stands the evidence in this case? We need not determine that a "conventional subrogation" will be found in case it appears that the lender "intended" or "supposed" he was to be equally well secured, as he would have been had he taken an assignment of the lien his advancements paid off and re-

leased (which, if so decided, might work a situation where one would be better off by failing to examine a record than if he had taken that precaution). Suffice it to say that where there is a promise on the part of the mortgagor or his transferee, given to one who pays money to pay off a lien, that such lender will be in equally as good position as regards security as the lien holder whose lien his money was intended to discharge and did discharge. He will be considered in equity as an assignee of the lien and especially where assurances are given him that his lien will be or is a first lien. The evidence in this case, we think, is amply sufficient to establish such a promise, if not expressed at least implied.

It follows, therefore, that in this case the court was correct in decreeing that Mrs. Zorn's lien was prior to Martin's and that she must share first in the proceeds from the sheriff's sale. The judgment went further and gave Mrs. Zorn not only a personal judgment against the Fritsch Loan & Trust Company, but against the Stovens. By the subrogation she appears to have gained even more than she bargained for. She thought she was getting a first lien on the property to secure a debt from the loan company but not to secure a debt equally due from Stovens and the loan company. By what is said in this opinion, it appears abundantly clear that equity will so adopt the doctrine of subrogation to work out justice in the situation but not to do more than justice calls for. The cases above examined speak of being subrogated to the "lien." Where the lender is dealing with the original mortgagor, subrogation to a released lien by considering it restored completely adjusts the matter, because the same person who was the debtor of the old lienholder is the debtor of the lender—the new lienholder. But where the mortgagor after going on a note has parted with the mortgaged property and it goes into the hands of another—in this case, the Fritsch Loan & Trust Company— and such other becomes the lender's debtor, such lender can be subrogated to the lien of the old creditor only as *security* for *his* debt *owing by the new title holder,* and not as *security*

*for the debt owing by the original mortgagor* who never had the debtor relationship with him, and he can only be subrogated to the extent of the debt with an obligation to pay 6 per cent, and not 7 per cent. As to the extra interest, Mrs. Zorn would come after Martin. Theoretically it may make no difference if the property fully pays the lender's debt, because as a practical matter the decree specifies the proper order of payment and simply prefers the lender in the distribution of the proceeds of the sale of the property which are ample to pay his debt with the interest figured at 6 per cent., but if it is necessary to come against a debtor personally, for a deficiency, the matter would be different. In such case, the lender should not be given resort to two persons where he bargained only for one. In that regard the judgment must be modified so as to reverse it as against the Stovens as far as it grants to Mrs. Zorn a personal judgment against them. The lower court is instructed to enter judgment accordingly. Costs to the respondent Zorn against Martin, but costs to the Stovens as against Zorn.

Since the appellants joined in their brief and abstract, being represented by the same counsel, we deem it fair to assess one-half of the costs against Zorn and that Martin bear the other half; the Stovens to bear no part thereof, and if the Stovens have paid any part they shall be entitled to recover from Zorn and Martin in that proportion. Costs of docketing the record in the Supreme Court, the remittitur, and transcript of the evidence are to be borne in the same proportion.

Such is the order.

ELIAS HANSEN, C.J., and FOLLAND, J., concur.

MOFFAT, Justice (dissenting).

The law relating to subrogation was reviewed in the former opinion in this case [90 Utah 130, 40 P. (2d) 213], and in the present prevailing opinion is further reviewed and the cases somewhat classified and what is termed a "development" suggested.

In my view, this case, as indicated in the former opinion, is not a case for the application of the doctrine of subrogation, unless when subrogation is invoked law flies out of the window and "judicial discretion" or the "dictates of justice" preempt the whole field, and the "soul of justice, equity and benevolence," guided by the "conscience of the chancellor," cuts the "roots" of the law and disregards contract relations and the implications arising therefrom. One of the maxims of equity is, "Equity follows the law."

There are expressions in the cases that "the doctrine of subrogation is a pure, unmixed equity, having its foundation in the principles of natural justice, and from its very nature could never have been intended for the relief of those who were in any condition in which they were at liberty to elect whether they would or would not be bound." *Aetna Life Ins. Co.* v. *Middleport*, 124 U. S. 534, at page 549, 8 S. Ct. 625, 630, 31 L. Ed. 537, quoting from the text of the case, and it is then said:

"This is perhaps as clear a statement of the doctrine on this subject as is to be found anywhere."

Yet the latter part of the quotation referred to contains this language:

"If one with a perfect knowledge of the facts will part with his money, or bind himself by his contract in a sufficient consideration, any rule of law which would restore him his money or absolve him from his contract would subvert the rules of social order."

Zorn parted with money with knowledge of the facts. It is said that "subrogation does not rest in contract." The expression does not accurately express what actually takes place in the operation of putting a subsequent creditor into the shoes of an antecedent creditor. Subrogation is "the substitution of one for another as a creditor, the new creditor succeeding to the former's rights in law and equity; the legal operation by which a third person who pays a creditor succeeds to his rights against the debtor as if he were his assignee." Webster's New International Dictionary, p. 2512.

Its operation arises out of a mistake or a contract, express or implied, whereby the subsequent creditor is advanced to the position of an antecedent one. The claim in the instant case, whether it be designated "equity," "subrogation," "legal fiction," or "unjust enrichment," is based upon the following assumptions, circumstances, and relations:

(a) The Zorn contract obligations with the Fritsch Loan & Trust Company evidenced by a 7 per cent. note and mortgage, taken with actual knowledge of the first mortgage and its release or intended release. (b) An alleged oral agreement or representation between Zorn and the Fritsch Loan & Trust Company whereby it is claimed said company represented that the note and mortgage it was giving Zorn constituted a first mortgage against the Hickenlooper property. (c) Knowledge on the part of both that there was a former contract consisting of a 6 per cent. note and mortgage made and executed by Stoven to the state of Utah and the amount thereof. (d) That the obligation to the state of Utah made by Stoven, notwithstanding its release, should be revived. (e) That when it is thus revived Zorn shall be substituted by subrogation in the place of the state of Utah and be entitled to proceed upon that obligation—a legal fiction, an equitable operation. See Bouv. Law Dict. (Baldwin's Cent. Ed. 1934) p. 1143. (f) That by substitution Martin is not hurt. (g) That the recording statute charged notice. That Zorn had possession of an abstract showing the facts as to all the documents and their contents. (h) The evidence is that of an interested witness, uncorroborated, whose testimony aside from interest is far from convincing and bears the earmarks of necessity, if not invention, with the only person who could corroborate or deny being dead. The evidence is far from satisfactory and far from that clear and convincing evidence required in such cases. One claiming fraud, mistake, or lack of notice must prove the claims clearly and convincingly.

On the facts of this case Stoven mortgaged to the state. Then Stoven sold the property (land and water) to Hicken-

looper. Hickenlooper mortgaged to Martin (the land only). Then Hickenlooper conveyed to Fritsch Loan & Trust Company (land and water). Then the Fritsch Loan & Trust Company mortgaged to Zorn (land and water). The Fritsch Loan & Trust Company was not a debtor to the state and was not liable either on the note or the mortgage made by Stoven to the state, and at the time of the trial of this action had passed into the hands of a receiver. All the Fritsch Loan & Trust Company stood to lose in the event of foreclosure by the state was the title to the property with a right of redemption, subject also to Martin's mortgage. On the state's foreclosure Stoven stood to lose not only the property but suffer a possible deficiency. The Fritsch Loan & Trust Company, or its successor, could redeem, but having purchased subject to that mortgage, Zorn by subrogation is put into a better position than the Fritsch Loan & Trust Company with whom she contracted. Such an operation is neither subrogation nor equity.

Had Zorn been a purchaser of the property from Fritsch Loan & Trust Company instead of a mortgagee, she would have been a "subsequent purchaser" within the *terms* of the statute. R. S. Utah 1933, § 78-3-2. The fact that a purchaser takes a warranty deed should at least be as strong a representation that the property is free and clear of encumbrances as an oral uncorroborated statement on the part of a mortgagee that the mortgagor said, "I will give you a first mortgage," or, "Yours will be a first mortgage."

The Zorn mortgage contains no word indicating that the Fritsch Loan & Trust Company intended it as a "first mortgage." The Fritsch Loan & Trust Company was in a different situation from that of Stoven, the original mortgagor. The Fritsch Loan & Trust Company could not say to Zorn with the same responsibility attaching thereto as Stoven, the original debtor, could have done, that, "Your mortgage will be a first mortgage."

In cases of secured obligations to pay, the security must be first exhausted, and when that is done resort may be had

against the obligor for any deficiency. Stoven became liable for a deficiency. That is what the trial court held and what must happen if Zorn is subrogated to the state's rights. In other words, Zorn steps into the shoes of the state. The state would have to sue on the note and mortgage. In such event Stoven could not escape liability either to pay the obligation or the judgment and take an assignment, or suffer the property to go to sale and be liable for a deficiency in case the property failed to bring the necessary amount. The prevailing opinion permits Zorn to step in, and the state and Stoven to step out. Martin could have said to the state before the release of the state's mortgage, "We will pay your mortgage and take an assignment," or, "We will pay your judgment and go against Stoven," or, "We will redeem if you foreclose and you may choose to take a deficiency against Stoven." Many of Martin's rights are by the prevailing opinion cut off. It cannot be said Martin is not injured. No authority is cited for relieving Stoven from the judgment rendered by the trial court under a contract to which Zorn is subrogated, and still hold the property under the "lien" created by the Stoven contract.

It may further be noted that under the evidence Zorn made Penner her agent. He drew the mortgage, told her the abstract had been examined, took the money to the state, received the release, had it recorded, and then turned the abstract and papers over to Zorn, all of which she testified she knew about. Penner was representative for both Zorn and the Fritsch Loan & Trust Company.

A further matter, evidently overlooked in the prevailing opinion, is that Zorn had a mortgage upon both land and water rights; Martin had a mortgage on land only. Martin, in any event, would be entitled to have the assets marshaled. Zorn should be required to exhaust the water right security first. Bouv. Law Dict. (Baldwin's Cent. Ed. 1934) p. 763; *Shewmaker* v. *Yankey*, 66 S. W. 1, 23 Ky. Law Rep. 1759; 3 Pomeroy's Equity Juris., § 1414. To be entitled to equity, one must be willing to do equity. Zorn can, under the judg-

ment, foreclose and sell the water right. It is not appurtenant to the land and not subject to redemption. Martin is therefore in the position, in the event of a sale, of being able to redeem the land only for the amount of the foreclosure sale price. He has no claim against the water. Zorn thereby gets payment and holds the water stock as profit in the event of her bidding the amount of the judgment. At the sale Zorn can force Martin to bid the amount of the judgment be cut off entirely or be left to the position of redemptioner of the land only.

For the reasons herein and those stated in the original opinion, I do not think the case one for the application of the doctrine of conventional subrogation. I therefore dissent.

EPHRAIM HANSON, Justice.

I concur in the views expressed in the dissenting opinion of Mr. Justice MOFFAT.