657 A.2d 1170

G.E. CAPITAL MORTGAGE SERVICES, INC.

v.

Steven A. LEVENSON.

No. 101, Sept. Term, 1994.

Court of Appeals of Maryland.

May 12, 1995.

228

230

Lawrence J. Gebhardt (Mark M. Dumler, Gebhardt & Smith, all on brief), Baltimore, for petitioner.

David P. Sutton (William Hoffman, both on brief), Baltimore, for respondent.

Argued Before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (retired) Specially Assigned.

RODOWSKY, Judge.

This case involves the operation and effect of equitable subrogation on the priority of liens against realty. Subrogation is

> "the substitution of one person to the position of another, an obligee, whose claim he has satisfied. ... The basic principles underlying subrogation are the same as those in constructive trusts, prevention of merger, and equitable liens, *i.e.*, restitution to prevent forfeiture and unjust enrichment."

G.E. Osborne, *Handbook on the Law of Mortgages* § 277, at 561 (2d ed. 1970) (Osborne). Although the doctrine of equitable subrogation may be applied in many contexts, one context involves the refinancing of a mortgage. Osborne states:

> "Where a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining

security equivalent to the discharged lien, and his money is so used, the majority and preferable rule is that if he did so in ignorance of junior liens . or other interests he will be subrogated to the prior lien. Although stressed in some cases as an objection to relief, neither negligence nor constructive notice should be material."

Osborne, § 282, at 570.

In the action before us a mortgage lender refinanced a first mortgage, unaware that judgment liens had arisen against the subject realty before the first mortgage was released and the new mortgage placed on the property. On foreclosure the new lender bought the property for less than the refinanced debt. The circuit court ruled that, under equitable subrogation, all liens against the realty, *i.e.*, the judgment and new mortgage liens, were extinguished, as if the refinanced first mortgage had been foreclosed. *Cf. Blanch v. Collison*, 174 Md. 427, 431, 199 A. 466, 468 (1938); *Leonard v. Groome*, 47 Md. 499, 504 (1878); A. Gordon, IV, *Gordon on Maryland Foreclosures* § 10.03, at 351–52 (3d ed. 1994) (Gordon). In *Levenson v. G.E. Capital Mortgage Servs., Inc.*, 101 Md.App. 122, 643 A.2d 505 (1994), the Court of Special Appeals ruled that, under equitable subrogation, the new lender, as foreclosure purchaser, held the realty subject to the lien of the first mortgage for the amount refinanced and subject to the judgment liens, as if there had been a foreclosure sale under a third lien subject to superior liens, so that the only lien extinguished was that of the new mortgage. *Cf. Tolzman v. Gwynn*, 267 Md. 96, 99–100, 296 A.2d 594, 596 (1972); *Baltimore Fed. Sav. & Loan Ass'n v. Eareckson*, 221 Md. 527, 529–30, 158 A.2d 121, 123–24 (1960); Gordon, § 10.01, at 349–50. Under the latter analysis, the foreclosure sale proceeds were to be credited against the portion of the new mortgage debt that exceeded the refinanced balance of the released first mortgage. *Levenson*, 101 Md.App. at 137, 643 A.2d at 512. For the reasons explained below, we agree with the analysis of the circuit court.

The party advocating the circuit court model of equitable subrogation is the petitioner, G.E. Capital Mortgage Services,

Inc. (G.E. Capital). G.E. Capital says that the refinancing and foreclosing mortgagee was its "predecessor." Brief of Appellant at 2. The party advocating the Court of Special Appeals model of equitable subrogation is the holder of the judgment liens, the respondent, Steven A. Levenson (Levenson).

The public record facts out of which this problem arose are set forth below. Of significance is that the names Yolanda Salcedo, Yolanda M. Better, Y. Maria Benson, Yolanda M. Benson, and Yolanda Benson are of one and the same person. She is the daughter of Miquel and Yolanda Better. The property is improved residential realty at 11 Gatespring Court in the Cockeysville area of Baltimore County.

April 15, 1980: Deed from Albert J. Bertini and wife to Miquel Better and Yolanda Better, his wife, as to an undivided half interest, and to Jaime Salcedo and **Yolanda Salcedo,** his wife, as to an undivided half interest.

April 15, 1980: Deed of trust securing $60,000 in favor of First Federal Savings and Loan Association of Annapolis (First Federal) from Miquel Better, Yolanda Better, his wife, Jaime Salcedo and **Yolanda Salcedo,** his wife.

April 23, 1986: Deed from Jaime Salcedo and **Yolanda Salcedo** to **Yolanda Salcedo** as to an undivided half interest. There was no monetary consideration for this deed, which recites that it was made "pursuant to a Separation and Property Settlement Agreement."

June 23, 1988: Levenson secured three judgments by confession in the Circuit Court for Baltimore County against **Yolanda M. Better.** These judgments aggregated $94,076.

March 21, 1990: Deed from Miquel Better and Yolanda Better to **Y. Maria Benson** (also known as **Yolanda M. Benson**) as to an undivided one-half interest in 11 Gatespring Court.

April 6, 1990: Execution of a deed of trust from **Yolanda M. Benson** to Trustee for Travelers Mortgage Services, Inc. (Travelers), the holder of a note secured thereby in the

amount of $131,200. The Travelers' deed of trust stated in part:

> "This Deed of Trust is a refinance of an existing Deed of Trust dated April 15, 1980 unto the Trustees for First Federal Savings and Loan Association recorded in Liber No. 6155, folio 238, which has been paid in the amount of $56,283.14, and the borrower herein certifies that said property is her principal residence and that she was one of the original borrowers of the aforementioned Deed of Trust."

April 17, 1990: Acknowledgement of payment endorsed on original deed of trust note by First Federal.

May 3, 1990: Deed of trust to Travelers recorded.

January 2, 1991: Original note, with acknowledgement of payment by First Federal, recorded.

Y. Maria Benson had applied on February 28, 1990 to Travelers for the aforesaid loan. In the written loan application Y. Maria Benson did not disclose as liabilities the judgments in favor of Levenson. Travelers' title examination did not pick up the judgments in favor of Levenson.

On February 12, 1991, power of sale foreclosure proceedings were instituted against the security. The advertisement for sale described the instrument empowering foreclosure as the deed of trust dated April 6, 1990. The statement of mortgage debt accompanying that docketing was signed by G.E. Capital as holder of, or agent for the holder of, the note secured by that deed of trust.

Several days prior to the public sale of 11 Gatespring Court the trustee for G.E. Capital obtained from a current title report actual knowledge of the Levenson judgments. The title insurer was notified, but no decision concerning the priority status of the Levenson judgments was made by G.E. Capital, its trustee, or its title insurer as of the date of sale. Counsel for Levenson attended the sale, and, prior thereto, he advised the trustee that Levenson claimed priority over the deed of trust securing G.E. Capital. By telephone the trustee sought and obtained instructions from G.E. Capital. That

lender would bid up to, but not above, $45,000, an amount roughly approximating the difference between the debt secured by the April 6, 1990 deed of trust and the amount of the Levenson judgments, with interest. If any bid exceeded $45,000, the auctioneer was to withdraw the property from sale. G.E. Capital's rationale was that it could not be hurt if it bought in at $45,000, even if the Levenson judgments had priority.

The respective parties to this action frankly acknowledge that they were not consciously aware of the doctrine of equitable subrogation at the time of the sale. Levenson did not bid. G.E. Capital successfully bid at $45,000.

After the sale had been ratified, and before any report by the auditor, Levenson filed a petition in the foreclosure action seeking a determination that his judgments had priority over G.E. Capital's deed of trust. In response, G.E. Capital contended that, under equitable subrogation, G.E. Capital stood in the shoes of First Federal and enjoyed a first priority to a maximum of $56,283.14, an amount that comfortably absorbed the $45,000 credit bid. The refinancing lender's legal position is that the junior liens of the Levenson judgments and of its own deed of trust were extinguished by foreclosure of the first lien acquired by subrogation. Consequently, G.E. Capital submits, it purchased the property free of liens and can convey an unencumbered title to a contract purchaser.

Levenson's position is that, under the circumstances of this case, equitable subrogation does not apply. He emphasizes that G.E. Capital advertised the sale as one made under an instrument recorded later than his judgments. Because his liens appeared to have priority, and because G.E. Capital never asserted a first priority based on equitable subrogation until after the foreclosure sale had been conducted, Levenson had no reason to bid at the sale, and, Levenson submits, he was thereby prejudiced. Had he bid cash to the amount of G.E. Capital's subrogated claim, he would then have been in a position to increase his cash bid by credit utilizing the principal amount and accumulated interest of his judgments. In

this way, he may have acquired the property at foreclosure. Having been deprived of that opportunity Levenson submitted in the courts below that equitable subrogation should not be applied, and he argues before us that the Court of Special Appeals' resolution of the matter should be affirmed. Alternatively, Levenson argues that he was not given in advance of sale the notice that a junior lienor is entitled to receive, both constitutionally and under Maryland statutes and rules of procedure, so that equitable subrogation may not extinguish his liens.

The circuit court, by judgment of June 17, 1993, ruled that G.E. Capital was subrogated to First Federal's first lien for the entire $45,000 mortgage foreclosure purchase price, and that the foreclosure extinguished Levenson's judgment liens and the lien of the 1990 deed of trust to Travelers.

On Levenson's appeal the Court of Special Appeals agreed that equitable subrogation applied, but it disagreed with the circuit court as to how the doctrine operated in the present case. The intermediate appellate court conceptually divided the lien of the G.E. Capital 1990 deed of trust into two components. One component, the "subrogated lien," represented that part of the secured indebtedness used to pay off, and obtain the release of, the First Federal deed of trust, that is, $56,283.14. 101 Md.App. at 134–35, 643 A.2d at 511. The second component, the "remainder lien," secured the balance of the amount advanced under the 1990 deed of trust. *Id.* at 135, 643 A.2d at 511.

The Court of Special Appeals held that "[i]n order to foreclose its equitably subrogated lien, the proper course for G.E. to have followed would have been to institute a declaratory action, or petition in the foreclosure proceeding, to establish an equitably subrogated lien, then advertise and foreclose as subrogee to the First Federal deed of trust." *Id.* at 137, 643 A.2d at 512. But G.E. Capital had not done this. Because of that failure the foreclosure actually conducted "was of G.E.'s deed of trust." *Id.* The court further held that

"the foreclosure sale was *subject to* G.E.'s equitable subrogation to the First Federal deed of trust and to Levenson's liens. We also hold that G.E.'s subrogated lien does not merge with its ownership of the property as purchaser at the foreclosure sale. Thus, the $45,000 in foreclosure sale proceeds should be distributed to G.E. to be applied to the remainder lien. G.E. holds title to the property subject to its subrogated lien and to Levenson's liens, while the remainder lien and any other junior liens are extinguished by the foreclosure sale."

*Id.* (emphasis added). The Court of Special Appeals uses the phrase, "subject to," in the technical sense, as if a third lien were being foreclosed without joinder or consent of the prior lienors. *See Tolzman v. Gwynn,* 267 Md. at 99–100, 296 A.2d at 596; *Baltimore Fed. Sav. & Loan Ass'n v. Eareckson,* 221 Md. at 529–30, 158 A.2d at 123–24; Gordon, § 10.01, at 349–50.

G.E. Capital petitioned this Court for a writ of certiorari which we granted. The petition raises two questions. The first question asks whether the intervening judgment liens are extinguished "when the amount bid at the foreclosure sale does not exceed the portion of the debt entitled to be equitably subrogated to the first-priority position of the refinanced deed of trust." The second question asks "[w]hether the right to equitable subrogation to the priority position of a refinanced deed of trust must be established prior to the foreclosure sale in a power of sale foreclosure either by a declaratory judgment or ruling in the foreclosure case if the foreclosure is to extinguish an intervening judgment lien." Levenson opposed the petition, but he did not raise any additional issues by conditional cross petition.

 The great majority of case law holds that one who pays the mortgage of another and takes a new mortgage as security will be subrogated to the rights of the first mortgagee

as against any intervening lienholder.[1] The court in *Metropolitan Life Ins. Co. v. Craven,* 164 Or. 274, 279, 101 P.2d 237, 239 (1940), said:

> "Our examination of the authorities leads us to the conclusion that, numerically, the greater weight of authority is to the effect that one, advancing money to discharge a prior lien on real or personal property and taking a new mortgage as security, is held to be entitled to subrogation to the prior lien as against the holder of an intervening lien of which he was excusably ignorant."

*See, e.g., Burgoon v. Lavezzo,* 92 F.2d 726, 735–36 (D.C.Cir. 1937); *Federal Land Bank v. Henderson, Black & Merrill Co.,* 253 Ala. 54, 59, 42 So.2d 829, 833 (1949); *Southern Cotton Oil Co. v. Napoleon Hill Cotton Co.,* 108 Ark. 555, 560–61, 158 S.W. 1082, 1084–85 (1913); *Wilkins, Neely & Jones v. Gibson,* 113 Ga. 31, 52, 38 S.E. 374, 383–84 (1901); *Emmert v. Thompson,* 49 Minn. 386, 392, 52 N.W. 31, 32 (1892); *Union Mortgage, Banking & Trust Co. v. Peters,* 72 Miss. 1058, 1071, 18 So. 497, 500 (1895); *George A. Hoagland & Co. v. Decker,* 118 Neb. 194, 198, 224 N.W. 14, 15 (1929); *Faires v. Cockerell,* 88 Tex. 428, 437, 31 S.W. 190, 194 (1895); *Martin v. Hickenlooper,* 90 Utah 150, 178–79, 59 P.2d 1139, 1152 (1936).

The commentators and treatise writers also agree with this principle:

> "If A's aid to B happens to take the form of a payment of the X mortgage, instead of an assignment, A nevertheless will be subrogated to the lien of that mortgage, equity keeping it alive so that the junior liens will retain their former position. Thus A can foreclose the X lien, by

---

1. By "intervening lienholder" we mean intervening in the sequence presented in this case when there has been a prior lien and then the intervening lien, followed by the release of the prior lien and the creation of a new lien in favor of the party who paid for the release of the prior lien. Excluded from the concept "intervening lienholder" is the sequence when there has been a prior lien, a release of the prior lien, a lien in favor of some third party, and then the creation of a lien in favor of the party who paid for the release of the prior lien. See *Burgoon v. Lavezzo,* 92 F.2d 726, 730 (D.C.Cir.1937).

subrogation, as a first mortgagee, against the junior liens as well as against B as mortgagor, despite the fact that, formally, the X mortgage appeared to have been discharged."

2 G. Glenn, *Mortgages, Deeds of Trust, and Other Security Devices as to Land* § 340, at 1424 (1943); *see also* E. Frank, *Title to Real and Leasehold Estates and Liens* 181–83 (1918); 2 L. Jones, *Law of Mortgages of Real Property* § 1119, at 569–70 (8th ed. 1928); R. Kratovil & R. Werner, *Modern Mortgage Law and Practice* § 31.01, at 493, 495 (2d ed. 1981); G.S. Nelson & D.A. Whitman, *Real Estate Finance Law* § 10.7, at 718–19 (2d ed. 1985); Osborne, § 282, at 571; 37 Cyclopedia of Law and Procedure, *Subrogation* 471–76 (1911); Comment, *Subrogation—An Equitable Device for Achieving Preferences and Priorities,* 31 Mich.L.Rev. 826, 834 (1933); Note, *Subrogation of One Paying Off a Mortgage to the Rights of the Mortgagee,* 21 Colum.L.Rev. 470, 471 (1921); Note, *Subrogation of Purchaser to Rights of Senior Mortgagee Against Junior Encumbrances,* 48 Yale L.J. 683, 688–89 (1939).

Early Maryland cases recognized subrogation as applied to a surety, but in the mortgage situation the early cases in this Court denied subrogation on the basis that the first mortgage was released when paid instead of having been assigned to the payor. *See, e.g., Gardenville Permanent Loan Ass'n v. Walker,* 52 Md. 452, 455 (1879); *Boyd v. Parker,* 43 Md. 182, 202–03 (1875); *Heuisler v. Nickum,* 38 Md. 270, 276 (1873); *Neidig v. Whiteford,* 29 Md. 178, 182–83 (1868); *Swan v. Patterson,* 7 Md. 164, 176 (1854); *Alderson v. Ames,* 6 Md. 52, 57 (1854); *Woollen v. Hillen,* 9 Gill 185, 194 (1850); *Clabaugh v. Byerly,* 7 Gill 354, 363 (1847); *see also* R.M. Venable, *The Law of Real Property and Leasehold Estates in Maryland* 209 (1892) ("But it is to be borne in mind that if on payment of the mortgage by some person entitled, the mortgage is *released,* there would be no rights of the mortgagee to which the person making payment can be substituted, and he will not have the benefit of the mortgagee's lien on the property."); *cf. Drury v.*

*Briscoe,* 42 Md. 154, 163 (1875) (subrogation allowed as first mortgage was never released).

This Court first applied subrogation in the mortgage context in *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831 (1886). In that case a husband who had pre-existing debts acquired realty, financing the acquisition by a purchase money mortgage. He then conveyed the property to his wife, as a gift, and the husband convinced a friend to pay off the purchase money mortgage and to take a new mortgage in its place. Creditors of the husband successfully set aside the transfer to the wife of the equity in the property, but this Court held that the property remained subject to the lien of the mortgage made to the friend. The new mortgagee was subrogated to the claim of the original purchase money mortgagee, and the security for the amount of the refinancing took the character of a purchase money mortgage. Affirming the ratification of an auditor's account in the husband's insolvency proceeding that awarded the new mortgagee priority over subsisting creditors, this Court said that unless the new mortgagee were substituted for the purchase money mortgagee, the former

> "must necessarily lose the money advanced and paid by him on account of the mortgage; and the payment thus made would enure to the benefit of [the husband's] subsisting creditors. It does seem to us, therefore, that he is upon the plainest principles of justice, entitled to the right of substitution."

64 Md. at 462, 2 A. at 835.

Subrogation in the mortgage context was also involved in *Finance Co. of America v. Heller,* 247 Md. 714, 234 A.2d 611 (1967). The first mortgage in that case encumbered a large tract. The owners of the land conveyed part of it to one Banks, without obtaining a partial release of the first mortgage. Banks agreed with his grantors to pay his proportional part of the first mortgage payments and taxes. Banks placed a second mortgage on his parcel, but he did not contribute to the first mortgage payments. The owners of the larger parcel paid one hundred percent of the first mortgage installments

for a period of time, but eventually defaulted. When the first mortgage was foreclosed, the sale produced a small surplus. In the auditor's account the owners of the larger parcel were awarded, under the theory of subrogation, reimbursement for the amount paid on behalf of Banks, thereby reducing the amount of the surplus available toward the second mortgage on Banks's parcel. We held this priority by subrogation to be proper. The holder of the second mortgage

> "was in no worse position than it would have been had the [owners of the larger parcel] made none of the payments due by Banks. This is so because the second mortgagee knew that the conveyance of the equity of redemption was subject to the first mortgage and that the entire tract of land was therefore primarily liable for the debt secured thereby."

*Id.* at 718, 234 A.2d at 613.

The Maryland precedent presenting facts more analogous to the instant matter is *Bennett v. Westfall*, 186 Md. 148, 46 A.2d 358 (1946). In that case a judgment was obtained against a husband and wife who owned property encumbered by a first and a second mortgage. After the second mortgage had matured the parties thereto agreed upon an extension which was effected by releasing the second mortgage and executing a new mortgage securing a greater debt. That increase ultimately was held to be usurious interest for the forbearance. The second mortgagee had not examined title before releasing the second lien and taking the new mortgage. When the second mortgagee discovered the intervening judgment, he sued to have the lien of the released second mortgage declared to be in effect. Affirming a decree granting that relief, this Court said:

> "It is clear that appellee's failure to consult the Land Records in no way affected the appellant. It certainly did him no harm. If his contention is sustained in this case it will do him a great deal of good, and this, too, because of a mistake made by appellee in not consulting the Land Records. His position is: You made a mistake, it did me no harm; in fact, resulted in greatly benefiting me. Therefore,

you can not have your mistake corrected. This position has no appeal to a court of equity. Negligence, therefore, if any there was, committed by appellee, caused no harm to the appellant and it is immaterial."

*Id.* at 154–55, 46 A.2d at 361.

■ G.E. Capital's refinancing of the First Federal mortgage also presents a sequence of transactions appropriate for equitable subrogation. G.E. Capital intended to achieve a first priority by the refinancing, but failed to do so because of the intervening judgment liens of which G.E. Capital was unaware. Thus G.E. Capital expended $56,283.14 of its funds for the release of First Federal's lien, an expenditure which inured at law to the benefit of Levenson who, absent equitable subrogation, would move into the first priority position previously occupied by First Federal. Equity views G.E. Capital as subrogated to the released, first priority claim of First Federal in order to prevent unjust enrichment of Levenson.

■ The Court of Special Appeals rejected the foregoing analysis in all cases in which the subrogated lender, prior to foreclosing, fails to obtain a judicial determination, in an action in which the intervening lienor is the adversary, that the apparently junior claim is recognized as subrogated and superior.

In support of the foregoing conclusion, Levenson relies on Maryland Code (1975, 1988 Repl.Vol., 1994 Cum.Supp.), § 7–105(c)(1) of the Real Property Article (RP). It provides:

"The holder of a superior recorded mortgage or deed of trust shall give written notice of any proposed foreclosure sale to the holder of any subordinate recorded mortgage, deed of trust, or other subordinate recorded or filed interest, including a judgment, in accordance with the requirements of the Maryland Rules applicable to the giving of notice to the mortgagor or grantor of the mortgage or deed of trust being foreclosed."

Similarly, Maryland Rule W74.a.2(c) provides:

"Before making a sale of mortgaged property, the person authorized to make the sale shall also send notice of the

time, place, and terms of sale by certified mail to the last
known address of

. . . .

"(iii) The holder of a recorded subordinate mortgage,
deed of trust, or other recorded or filed subordinate inter-
est, including a judgment, in the mortgaged property."

The operation of the equitable subrogation principle is not
directly addressed by either the statute or the rule, and the
Court of Special Appeals did not rest its holding on an
application of either provision. Levenson maintains that be-
cause he was not in fact sent the notices required to be sent to
a junior lienor by a senior mortgagee, he was justified in
assuming that his judgment liens were senior, and in not
bidding. G.E. Capital, on the other hand, points out that its
advertisement in effect announced that a first priority lien was
being foreclosed, because the advertisement did not specify
any senior liens to which the sale would be subject. Gordon,
§ 10.01, at 349, states that, if the mortgage being foreclosed is
junior to one or more liens "ordinarily the sale will be 'subject
to' said mortgage and the advertisement will customarily and
ideally so indicate."

We view the parties' procedural arguments essentially to be
a standoff. In the instant case, if we assume, *arguendo,* that
the procedural requirements of RP § 7–105(c)(1) and of Rule
W74.a.2(c) were not followed by G.E. Capital, Levenson never-
theless had actual knowledge that G.E. Capital claimed a first
priority position for part of the debt owed to it, and, as we
shall see below, Levenson had that knowledge in time to
challenge the claimed first priority, and did so.

■ The requirement created by the Court of Special Ap-
peals for a pre-foreclosure adjudication in an adversary pro-
ceeding with the claimant to the competing priority would
operate to negate equitable subrogation in many instances in
which it historically has been applied. One of the elements
that permits a court to apply equitable subrogation is the
absence of actual knowledge on the part of the subrogation
claimant concerning the intervening lien. *See, e.g., Bennett v.*

*Westfall,* 186 Md. at 155, 46 A.2d at 361; *Martin v. Hicken-looper,* 90 Utah 150, 59 P.2d 1139; Osborne, § 282, at 573. Thus, the innovation by the Court of Special Appeals requires, in advance of foreclosure, knowledge which the subrogation claimant must lack at the time of the payment giving rise to the subrogation claim. If the creditor who could be benefited by equitable subrogation fails to discover the unknown intervening lien before advertising and selling, but does discover the intervening lien before distribution, the subrogation claim would be too late under the rule of the Court of Special Appeals.

■ The latest time by which a claimant may assert priority over the intervening lienor based upon equitable subrogation ordinarily would be on exceptions to an auditor's report that did not apply the doctrine. Absent unusual circumstances, those exceptions may be filed up to the time when the court ratifies the audit. *Schwartzman v. Payne,* 203 Md. 256, 262–63, 100 A.2d 23, 26 (1953). Consequently, the requirement imposed by the Court of Special Appeals accelerates this deadline for a subrogation claimant, and, in that respect, conflicts with the procedure under Maryland Rules W74.e (audit mandatory in mortgage foreclosures) and BR6.b.5 (statement of account by auditor).

The holding by the Court of Special Appeals apparently was intended to protect an intervening lienor from forsaking the opportunity to bid because of a mistaken reliance on an apparent priority. But the rule crafted by the intermediate appellate court permits the intervening lienor to create an intentional trap for an unsuspecting subrogation claimant. If the potential subrogation claimant advertises and sells without knowledge of the intervening lien, but the intervening lienor knows of the potential subrogation claim, it is to the advantage of the intervening lienor, under the holding of the Court of Special Appeals, to remain silent and allow the potential subrogation claimant to proceed in ignorance. Then, after the sale is ratified, the intervening lienor may safely claim the priority of record at the audit stage, when it would be too late

for equitable subrogation to be asserted. We do not imply that the intervening lienor would have a duty to speak under those circumstances. But the circumstances hypothesized above illustrate that, in any given case, one or the other of the competing creditors may be ignorant of the law of equitable subrogation. Although the basic purpose of the equitable subrogation doctrine is to prevent unjust enrichment, the rule of the Court of Special Appeals would promote unjust enrichment in some circumstances.

Finally, the procedure required by the Court of Special Appeals is at odds with the policy of Maryland law to expedite mortgage foreclosures. Foreclosure pursuant to a power of sale is intended to be a summary, in rem proceeding. In that type of proceeding a sale of the mortgaged property can be held in approximately twenty-one days after docketing. Rules W72 and W74.a(2). The procedure required by the Court of Special Appeals, however, is (1) "to institute a declaratory action, or [file a] petition in the foreclosure proceeding," (2) "establish an equitably subrogated lien," (3) "then advertise," and (4) then "foreclose as subrogee...." *Levenson*, 101 Md.App. at 137, 643 A.2d at 512. Litigating to judgment the dispute over a priority based on a known claim to equitable subrogation before the foreclosure sale may even be advertised converts a summary foreclosure into a full-scale, in personam, adversarial action. While the priorities are being litigated pre-sale under the rule espoused by the Court of Special Appeals, interest at the mortgage rate is running against the mortgagor, absent contrary provision in the instrument. RP § 7–105(d); Gordon, § 35.02, at 1028–29.

For these reasons we hold that it was not necessary for G.E. Capital, in order to have equitable subrogation applied to the refinancing portion of its loan, successfully to have litigated its right to assert equitable subrogation before advertising the sale. Where there is an issue concerning priorities on distribution between creditors in the mortgage foreclosure context, one of whom relies on equitable subrogation, the issue

ordinarily can be determined in connection with the auditor's report.

 Relying principally on *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), Levenson argues that applying equitable subrogation in the instant matter deprives him of property without due process because "the holders of junior liens are constitutionally entitled to the kind of advance notice required to enable them to adequately protect their interests." Brief of Appellee at 21. No issue of constitutional dimension is presented in the case at hand. *Mennonite* invalidated under the Due Process Clause, at the instance of a mortgagee who had no actual notice, an Indiana tax sale procedure that relied only on constructive notice by publication to advise even reasonably identifiable mortgagees of the tax sale. "The tax sale immediately and drastically diminishes the value of this security interest by granting the tax-sale purchaser a lien with priority over that of all other creditors," and, ultimately, possible "complete nullification of the mortgagee's interest...." *Id.* at 798, 103 S.Ct. at 2711, 77 L.Ed.2d at 187.

 In the case before us, Levenson's judgments were secondary to the First Federal mortgage from the instant that the judgments obtained lien status. Under Maryland law, enunciated as early as 1886 in *Milholland v. Tiffany,* 64 Md. 455, 2 A. 831, a refinancing lender could retain First Federal's priority either by assignment or by equitable subrogation. Levenson's position seems to be that, after G.E. Capital paid First Federal in full under the mistaken belief that the new mortgage to G.E. Capital would be a first lien, the first priority that Levenson's judgments appeared to have on the face of public record at the time of foreclosure was a property right that could not be lost by operation of an equitable doctrine unless, prior to the foreclosure sale, G.E. Capital advised Levenson of the doctrine and that G.E. Capital would rely on it. Due process does not require such solicitude between competing creditors. We hold that Levenson's actual knowledge in advance of the foreclosure sale that the sale

would be held, his opportunity to bid, and his opportunity to litigate the applicability of equitable subrogation before distribution of the sale proceeds fully satisfied the requirements of due process under the facts of this case.

 The Court of Special Appeals also held that a foreclosure in which the foreclosing creditor is subrogated in whole or in part to a prior senior lien does not extinguish an intervening lien, if the foreclosing creditor fails to litigate equitable subrogation prior to advertising the sale. We disagree.

 Although no prior Maryland appellate case has addressed this aspect of equitable subrogation, a number of decisions in Texas have been explicit on the subject. The Texas cases, reviewed below, demonstrate that where a lien, otherwise inferior to the intervening lien, is subrogated to a lien of higher priority than the intervening lien, foreclosure extinguishes the intervening lien so that the purchaser at the foreclosure sale takes the land free of the intervening lien. The intervening lienor, however, is entitled to distribution of proceeds in accordance with that lienor's priority, after the record priorities have been reordered under equitable subrogation.

The intervening lienor in *Providence Inst. for Sav. v. Sims,* 441 S.W.2d 516 (Tex.1969), made the same argument made by Levenson in the case now before us. In *Providence* the first lien was held by A, holder of a $150,000 note secured by a deed of trust. B, the intervening lienor, obtained a mechanic's lien. C thereafter loaned the debtor $180,000 which was secured by a deed of trust and of which approximately $105,-000 was paid to A to reduce its secured indebtedness.[2] A, whose deed of trust had never been released, agreed with C to

---

2. The deed of trust to C also expressly provided for subrogation. Inasmuch as B was not "placed in a worse position by the transaction," the significance of the fact that the debtor expressly agreed to subrogation was said to be that "neither actual nor constructive knowledge [by C] of the intervening lien will defeat the right of subrogation to which the debtor agreed...." 441 S.W.2d at 520.

subordinate to C's claim the $45,000 balance due to A. C foreclosed its deed of trust and sold the property for $150,000. The purchaser at the foreclosure sale then brought the action in the reported case for a declaration that the property was free of the intervening lien. Because the subordination agreement between A and C did not affect A's priority over B, and, if C were subrogated to a first lien position to the extent of $105,000, that subrogation claim together with A's claim to $45,000 would exhaust the sale proceeds. Consequently, the intervening lienor argued that C's "foreclosure under its own deed of trust, rather than the deed of trust given for the benefit of [A], did not affect the mechanic's lien." *Id.* at 518.

Rejecting this argument the Texas Supreme Court said:

"By virtue of its subrogation to the first lien, [C] occupied the same position as [A] with respect to that lien. Its deed of trust did not create an entirely new lien but preserved the existing lien and prescribed new terms and conditions for foreclosure. [The debtor] was authorized to execute the deed of trust for that purpose, since it owned the equity of redemption and was primarily liable on the indebtedness to [A], provided the position and rights of the intervening lienholder were not prejudiced thereby.

"The deed of trust to [C] was a first lien on the property, and the purchaser at the foreclosure sale acquired title free of the mechanic's lien. There is no contention that respondent was prejudiced in any way by lack of notice of the trustee's sale or of the fact that the proceeds of [C's] loan were used to retire part of the indebtedness owing to [A]."

*Id.* at 520–21 (citations omitted).

Indistinguishable from the case before us are the facts in *Houston Inv. Bankers Corp. v. First City Bank,* 640 S.W.2d 660 (Tex.Ct.App.1982). The first lien was a purchase money deed of trust securing a $170,000 note to A. Thereafter B obtained an appropriately indexed judgment against the same debtor. Then C refinanced, securing by deed of trust a note for $190,000, from which $157,567.09 were paid fully to release A's deed of trust. C then sold its note to D. D foreclosed and

bought the property for $50,000. In the reported action D sued B to clear title. The deed of trust to C contained no subrogation provision so that *Houston Inv. Bankers* represents an application of equitable subrogation only.

The court described the legal effect of the transactions as follows:

"[I]n exchange for its funds [C], in effect, purchased [A's] subsequently released lien. We hold as a matter of law that [C] is equitably subrogated to the vendor lien rights of [A] and, therefore, occupies the same position as [A] with respect to that lien and to the extent of that lien. Such equitable subrogation does not prejudice [B], but leaves [B] in the same position it was in on the date it filed its abstract of judgment. When [D] foreclosed its deed of trust lien held by assignment from [C], it foreclosed the preexisting vendor's lien, and [the security] was transferred free of [B's] judgment lien. There was no contention in the trial court and no point raised in this court that the property was sold at foreclosure for more than the amount to which [D] was equitably subrogated. In fact, the trustee's deed in evidence and included in the record reveals that there were no excess proceeds from that sale, [the security] having been purchased for $50,000.00 cash. We therefore ... render judgment that the trustee's sale extinguished [B's] abstract of judgment lien on [the security], and we order [B's] judgment lien removed as a cloud upon the title...."

*Id.* at 663–64.

Other decisions of Texas courts illustrating the extinguishment of an intervening lien as a lien on the security, following foreclosure of a lien which was granted priority by virtue of subrogation, are: *Diversified Mortgage Investors v. Lloyd D. Blaylock Gen. Contractor, Inc.,* 576 S.W.2d 794 (Tex.1978); *Richards v. Suckle,* 871 S.W.2d 239 (Tex.Ct.App.1994); *Med Center Bank v. M.D. Fleetwood,* 854 S.W.2d 278 (Tex.Ct.App. 1993); *Chicago Title Ins. Co. v. Lawrence Invs., Inc.,* 782 S.W.2d 332 (Tex.Ct.App.1989); and *Texas Commerce Bank*

*Nat'l Ass'n v. Liberty Bank,* 540 S.W.2d 554 (Tex.Ct.App. 1976).

Levenson relies on language supporting an alternate holding in *First Nat'l Bank v. O'Dell,* 856 S.W.2d 410 (Tex.1993), but the case is not on point. There, the subrogation claimant was a bank that made a fourth lien loan. It utilized part of the proceeds to acquire the notes that were respectively secured by first and second lien deeds of trust on the property. O'Dell, who held the third lien, was liable on the two notes, each of which required that the debtor be notified of defaults. The bank foreclosed on the first and second deeds of trust, without notice to O'Dell, and then claimed that O'Dell's third lien had been extinguished. The court held that the bank could not unilaterally alter the contract rights to notice under the terms of the notes acquired by it. Further, it appears that the bank in *O'Dell* had actual knowledge of the intervening liens so that, under *Bennett v. Westfall,* 186 Md. 148, 46 A.2d 358, the bank would not be entitled to claim equitable subrogation under Maryland law.

*Jack v. Wong Shee,* 33 Cal.App.2d 402, 92 P.2d 449 (1939), also cited by Levenson, holds that the claimant waived equitable subrogation by seeking to recover in excess of the amount paid to release the prior lien.

In its *Levenson* decision, the Court of Special Appeals made non-extinguishment of the intervening lien a byproduct of the absence of an assertion of equitable subrogation prior to advertising the sale. The consequence of that ruling is that G.E. Capital, as purchaser at the sale, holds 11 Gatespring Court not only subject to a $56,283.14 lien by subrogation, but, more important, subject to Levenson's judgment liens of $94,076 plus interest accruing from 1988. In lieu of the foreclosure's having extinguished all liens, with the claims and priorities transferred to the sale proceeds, the property would remain encumbered under the Court of Special Appeals decision. In *Haskell v. Carey,* 294 Md. 550, 451 A.2d 658 (1982), this Court, in a different context, said that it seeks to "achieve a proper balance between the public interest in preventing

injustice and individual hardship resulting from legal technicalities, and the public interest in assuring marketable title promptly after a judgment foreclosing a right of redemption." *Id.* at 559, 451 A.2d at 663–64. Here, we achieve a proper balance between hardship to the intervening lienor and marketable title of the foreclosed property by leaving Levenson in no worse a position than he was in when his judgments were obtained and by recognizing that foreclosure under the subrogation claim extinguished that superior lien and the inferior liens.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS, REVERSING THE JUDGMENT OF JUNE 17, 1993 OF THE CIRCUIT COURT FOR BALTIMORE COUNTY, REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF JUNE 17, 1993 OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, STEVEN A. LEVENSON.*