—— A.2d ——

**Matthew A. EGELI, Substitute Trustee**

v.

**WACHOVIA BANK, N.A.**

No. 2976, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 6, 2009.

John Griffin (Hartman & Egeli, LLP on the brief), Annapolis, for Appellant.

Martin S. Goldberg (Jeffrey B. Fisher, Scott R. Robinson, Fisher Law Group, PLLC on the brief), Upper Marlboro, for Appellee.

Panel: DAVIS, DEBORAH S. EYLER, MATRICCIANI, JJ.

MATRICCIANI, Judge.

This case arises out of a foreclosure sale of property ("the Property") located in Baltimore County, owned up until that sale by Naim and Donna Reza ("the Rezas"). Three lenders—SunTrust Mortgage, Inc. ("SunTrust Mortgage"), SunTrust Bank, and Wachovia Bank, N.A. ("Wachovia") [1]—held liens on the Property prior to the sale. In conjunction with one of its two loans to the Rezas, Wachovia paid the entire outstanding balance on the Rezas' SunTrust Bank home equity credit account. The Rezas eventually defaulted on that SunTrust Bank account, and SunTrust Bank and Wachovia disputed the priority of their liens on the Property.

The Circuit Court for Baltimore County found that Wachovia enjoyed superior lien priority to SunTrust Bank in receiving the proceeds from the sale, and SunTrust Bank, through Matthew Egeli, its Substitute Trustee for the foreclosure sale,

---

1. Although SunTrust Mortgage, Inc., and SunTrust Bank are both affiliates of SunTrust Banks, Inc., they are separate legal entities, and we therefore distinguish them in this opinion.

appealed. SunTrust Bank presents the following issues for our review:

 I. Whether the trial court erred in determining that SunTrust Bank surrendered its lien priority upon receipt of payment from Wachovia.

 II. Whether the doctrine of equitable subrogation applies to the instant case.

 III. Whether Wachovia should be estopped from taking inconsistent positions in the same proceeding.

For the reasons we explain, we reverse the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On October 17, 2002, the Rezas executed a note for $307,000 with SunTrust Mortgage, secured by a deed of trust on the Property, which was promptly recorded. On November 27, 2002, the Rezas opened a credit line account with SunTrust Bank with a credit limit of $140,000, and executed an Equity Line Agreement and Disclosure Statement ("the Agreement") as evidence of the indebtedness. The Agreement provided that the Rezas could draw funds and carry any balance up to a limit of $140,000, as long as they paid the minimum payment each month. The Agreement also provided:

> You may obtain loans for 10 years from the date of this Agreement (the "Draw Period").... After the Draw Period and any extension(s) ends, you no longer will be able to obtain loans and you must repay the outstanding balance over the repayment period described below (the "Repayment Period"). The Repayment Period will be 20 years.

The Agreement further provided:

> **Termination by You.** If at any time you wish to terminate your Equity Line, you need only send us a written statement to that effect.... The termination will be effective upon our acknowledgment that your request has been received. Any termination of your Equity Line shall not

affect your obligation to repay amounts you owe in the manner provided in this Agreement.

The Rezas executed a deed of trust in favor of SunTrust Bank on that same day, putting up the Property as security for the note. That deed of trust was recorded on January 26, 2003. On the first page it provided, *inter alia:*

> **REVOLVING LINE OF CREDIT.** Specifically, in addition to the amounts specified in the indebtedness definition, and without limitation, this Deed of Trust secures a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time . . . shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of the Grantor and Lender that this Deed of Trust secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Deed of Trust and any intermediate balance.

By February 2003, the Rezas had nearly exhausted their credit line. They continued to make monthly payments as required by the Agreement.

Although the record is silent, it appears that the Rezas requested that Wachovia assist them in their obligation to SunTrust Bank, and Wachovia in turn contacted SunTrust Bank regarding the same. On December 13, 2004, SunTrust Bank sent Wachovia a letter by facsimile regarding the Rezas' account. That letter identified the Rezas' account number as "04900004431308523," and stated:

> Thank you for your recent inquiry to our Customer Care Department regarding the payoff of the above referenced installment loan. This statement reflects the status of this loan account as of the payoff effective date reflected below and may change due to items in the process of being received, charged or collected to the loan account. Any

payments, charges or other changes should be verified prior to payoff.

The letter further stated that the **"Payoff Amount"** was $135,898.59, effective December 13, 2004, and identified a per diem surcharge beyond that date of $18.84.

On December 15, 2004, the Rezas opened a commercial line of credit with Wachovia in the amount of $180,000. That line of credit was also secured by the Property. A deed of trust to that effect was executed on the same day, and was recorded on January 13, 2005.

On December 16, 2004, the Rezas opened a line of credit with Wachovia in the amount of $175,000. That credit line was secured by a deed of trust dated December 16, 2004, and recorded on January 10, 2005.

On December 23, 2004, Wachovia mailed a check to Sun-Trust Bank in the amount of $136,237.71. In the memo portion of the check, Mr. Reza was identified as the "customer," "0490000044313065" was identified as the "Payoff Account Number," and "MORTGAGE PAYO" was listed as the "Purpose." A cover letter accompanied the check. Although it identified Mr. Reza as the subject of the letter, it identified the account number as "049000004431306523." The letter stated, "Enclosed please find an official check made payable to your institution. Please accept this check to either:" That language was followed by nearly two inches of blank space, below which was a bifurcated text box, the left-side portion of which was entitled **"MORTGAGE LIENS,"** and stated "For mortgage liens, please send your satisfaction of mortgage to the appropriate courthouse for release." Below that box the letter stated "If you have any questions regarding the payoff, please contact Wachovia Bank . . . at 1–877–259–9566."

On December 24, 2004, Wachovia's check was credited to the Rezas' SunTrust Bank credit account, creating a positive balance of $1,745.85. In April 2005, the Rezas again drew on the SunTrust Bank credit account, and by December 2005, the Rezas had nearly exhausted the account. The balance on the account remained near $140,000 until the Rezas defaulted by

failing to make a minimum monthly payment in December 2006.

On March 21, 2007, SunTrust Bank's foreclosure action was entered in the docket of the Circuit Court for Baltimore County. On April 6, 2007, counsel for Wachovia sent an email to SunTrust Bank's Substitute Trustee. Wachovia's counsel stated that Wachovia held two junior liens relative to Sun-Trust Bank, but it was Wachovia's understanding that,

> when one of the Wachovia liens originated, funds from same were used to satisfy the SunTrust credit line, AND, correspondence instructing SunTrust to close the credit line account was transmitted with the payment.
>
> Please inquire of SunTrust if the credit line mistakenly remained open after satisfaction. If so, I believe your sale must be conducted subject to the Wachovia lien/liens.

SunTrust Bank's trustee responded, explaining that

> SunTrust would not have closed the credit line without written authorization from the customer. To the best of my knowledge, no such authorization was received. Accordingly, although the credit line balance was paid, the account remained open and lien created by the credit line deed of trust remained in place.

The foreclosure sale occurred on April 16, 2007, at which Wachovia bought the Property for $260,000, subject to Sun-Trust Mortgage's first priority lien.[2]

On June 5, 2007, Wachovia filed two motions—one for each of its liens on the Property—to intervene and receive surplus proceeds from the sale. Both motions stated that Wachovia was "entitled to distribution of surplus proceeds in the context of this foreclosure after payment of the deed of trust foreclos-

---

2. At the date of the sale, the balance owed under SunTrust Mortgage's senior deed of trust was $248,624.03. Thus, the total amount of Wachovia's purchase was $508,624.03. Wachovia satisfied SunTrust Mortgage's lien at settlement, and it is therefore not an issue in this appeal.

ed herein." On July 13, 2007 and August 17, 2007, the circuit court granted Wachovia's motions.[3]

The auditor's report indicated that, after satisfaction of SunTrust Bank's foreclosed deed of trust, which, after costs and fees amounted to $189,313.95, a surplus of $80,186.75 was to be paid to Wachovia pursuant to the court's August 17, 2007 order.[4] On September 21, 2007, Wachovia filed exceptions to the auditor's report, asserting that its liens were entitled to priority distribution ahead of SunTrust Bank based on theories of equitable subrogation and equitable estoppel. SunTrust Bank opposed Wachovia's exceptions, and on November 14, 2007, the circuit court held a hearing.

At that hearing, counsel for SunTrust Bank argued that the Rezas' credit line account was

> like a credit card. You can pay it down to zero, it stays open. SunTrust [Bank], under [the Agreement], was liable to make advances on it through 2012, up to the credit line.... If SunTrust [Bank] unilaterally closes the account because [the Rezas, Wachovia, or some other third party] makes a payment, [SunTrust Bank] is in breach of that contract.

SunTrust Bank made the distinction between "paying down" an open-ended credit line account like the Rezas', and "paying off" a traditional loan. It also argued that the relevant statutory provisions require that a lender release its lien when there are no further obligations by either party to the loan or credit extension, not when the lender is paid.

Counsel for Wachovia argued that Wachovia relied upon SunTrust Bank's "payoff statement," which, counsel emphasized, "was silent as to the fact that it's a credit line deed of trust and it is also silent as to what needs to be done to obtain a release of the deed of trust from the land records."

---

3. No monies were actually released to Wachovia by those orders.

4. The surplus was to be to Wachovia pursuant to the court's August 17, 2007 order because that order addressed the first deed of trust Wachovia recorded.

Upon conclusion of argument, the court ruled from the bench in favor of Wachovia, stating:

I find as a fact, that SunTrust Bank when it received a payoff of the $140,000 loan or line of credit, loan, it's not a line of credit, it's a loan.... When that was paid off, [SunTrust Bank] knew that was paid off, they knew it was paid off by Wachovia. They knew that another bank had done that. They knew that if they lent other money to the Rezas that they would be in priority under the pay off from Wachovia. It's just common sense.... So I grant the exceptions.

On January 18, 2008, the court entered its order granting Wachovia's exceptions, and ordering that, after payment of fees and costs, the remainder of the proceeds from the foreclosure sale—some $262,078.70—were to be applied to Wachovia's two liens in the order of their recordation. The court ordered that the auditor's report be amended accordingly, and ratified and confirmed that amended audit.

SunTrust Bank's Substitute Trustee noted a timely appeal.

## DISCUSSION

### I.

█ SunTrust Bank argues that the court erred in determining that it surrendered its lien priority upon accepting payment from Wachovia covering the entire balance of the Rezas' SunTrust Bank credit line account. SunTrust Bank argues that, under the terms of the Agreement, it was obligated to advance funds to the Rezas until 2012 absent the Rezas' written authorization to close the account, and SunTrust Bank never received that authorization. That continued obligation, SunTrust Bank argues, excused it from releasing its lien notwithstanding its acceptance of Wachovia's payment. We agree.

The terms of the Agreement are clear and unambiguous. SunTrust Bank was obligated to advance the Rezas money on an ongoing basis during a ten-year time period so long as the

Rezas made minimum monthly payments and the total balance at any one time never exceeded $140,000. Absent those conditions (and several others, *i.e.*, maintenance of insurance on the collateral Property, none of which were raised by either party, and, in any event, are not pertinent to this appeal), termination of the agreement required the Rezas' written authorization.

Wachovia notes that it was not aware of those terms because it was not a party to the Agreement. That point conceded, Wachovia, and indeed the world, were constructively on notice of the terms contained in SunTrust Bank's duly recorded deed of trust. That deed of trust provided, in pertinent part,

> **REVOLVING LINE OF CREDIT.** Specifically, in addition to the amounts specified in the indebtedness definition, and without limitation, this Deed of Trust secures a revolving line of credit, *which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time ... shall not exceed the Credit Limit as provided in the Credit Agreement.* It is the intention of the Grantor and Lender that this Deed of Trust secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Deed of Trust and any intermediate balance.

(Emphasis in italics added).

We conclude that SunTrust Bank's deed of trust provided sufficient notice, especially to a sophisticated party such as Wachovia, that the type of account at issue was an open-ended equity credit account. Consequently, Wachovia, at a minimum, was on notice that there may have been additional requirements to satisfy the terms of the contract creating the account other than mere payment of the balance.

With respect to a release of a recorded deed of trust, Md.Code (1974, 2003 Repl.Vol., 2008 Supp.), § 3–105.1(c) of the Real Property Article ("RP") provides:

> *Procedure for release.*—Within a reasonable time after a loan secured by an existing mortgage or deed of trust has been paid in full and there is no further commitment by the holder to make an advance or by the borrower to incur an obligation secured by that mortgage or deed of trust, the holder shall:
>
> [subsection (1) omitted]
>
> (2) Release any recorded mortgage or deed of trust securing the loan.

There was no evidence presented at the hearing that the Rezas provided SunTrust Bank written authorization to terminate the account, nor was there any evidence that Wachovia attempted to facilitate such action. Consequently, SunTrust Bank's obligation to make advances to the Rezas continued, and SunTrust Bank was not required under RP § 3 –105.1(c) to release its lien upon acceptance of Wachovia's payment.

 Wachovia nevertheless argues that the circuit court correctly found that SunTrust Bank was equitably estopped from claiming a superior lien priority insofar as SunTrust Bank's deed of trust and payoff statement were silent regarding any additional requirements necessary to obtain a release of SunTrust Bank's lien on the Property. Wachovia further argues that SunTrust Bank, being in the business of mortgage lending and servicing, should have understood that acceptance of Wachovia's payment created an affirmative duty to release the lien. In sum, Wachovia argues that equitable estoppel should apply to this case because it acted in good faith and according to the customs of its industry in expecting SunTrust Bank to release the lien, and it therefore reasonably relied to its detriment upon SunTrust Bank to take that action.

We have already concluded that SunTrust Bank's deed of trust was sufficiently clear to put Wachovia on notice that the underlying debt which the deed of trust secured was not a typical loan, but rather a revolving line of credit. Thus, it may

have required action beyond mere payment of the balance to obligate SunTrust Bank to release its lien. Wachovia's argument regarding SunTrust Bank's payoff statement is therefore unpersuasive, and any argument regarding Wachovia's subjective intent when making the payment is irrelevant.

RP § 3–105.1(e) provides, in pertinent part:

If the holder does not record the release or provide the release to a responsible person for recording within 45 days after a loan secured by an existing mortgage or deed of trust has been paid in full and there has been no further commitment by the holder to make an advance or by the borrower to incur an obligation secured by the mortgage or deed of trust, the holder shall furnish the borrower with . . . [a release in recordable form and a notice disclosing the location where the release should be recorded].

Thus, if, as Wachovia argues, the Rezas' SunTrust Bank credit account should have been closed upon SunTrust Bank's acceptance of Wachovia's payment, SunTrust Bank would have been obligated under RP § 3–105.1(e) to provide a release for recording within 45 days.

There is no record evidence, however, that Wachovia took any action regarding SunTrust Bank's failure to provide a release. In fact, it was not until the foreclosure sale neared— more than two years after Wachovia made its payment—that Wachovia noticed that a release was never recorded. Indeed, nearly three years elapsed from Wachovia's payment until it formally asserted that it had a superior lien priority to SunTrust Bank.

Furthermore, the record demonstrates a lack of attention to detail on the part of Wachovia throughout its dealings with SunTrust Bank. Indeed, the check and accompanying cover letter Wachovia sent SunTrust Bank on behalf of the Rezas contained multiple errors, including the account number referenced therein. We acknowledge that the transactions at issue took place during the home equity boom, at a time when lenders were often overwhelmed and therefore may have relaxed their procedural or transactional standards. That

fact, however, cannot excuse lenders, in this case Wachovia, from complying with the strictures of the law, especially when their failure to comply works to the detriment of other parties, in this case SunTrust Bank.

■ We do not think Wachovia should be granted an equitable remedy when any harm it may have suffered was a result of its own carelessness. In fact, we conclude that Wachovia is barred from equitable relief by the doctrine of laches. That doctrine "applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party." *Liddy v. Lamone*, 398 Md. 233, 244, 919 A.2d 1276 (2007). Wachovia's carelessness and delay was prejudicial to SunTrust Bank because the Rezas continued to draw funds from the account to the point of default, and were SunTrust Bank, as the circuit court ruled, equitably estopped from claiming a superior lien priority to Wachovia, SunTrust Bank would receive none of the proceeds of the foreclosure sale it initiated and completed.

## II.

SunTrust Bank argues that the court erred in implicitly relying upon the doctrine of equitable subrogation in granting Wachovia superior lien priority to SunTrust Bank. Because we have already held, *supra*, that Wachovia is precluded from an equitable remedy by the doctrine of laches, we need not determine whether Wachovia was entitled to be equitably subrogated to SunTrust Bank's lien position. Nevertheless, we briefly address the parties' arguments in the interest of comprehensiveness.

■ The doctrine of equitable subrogation provides that, "[w]here a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining security equivalent to the discharged lien, and his money is so used, the majority and preferable rule is that if he did so in ignorance of junior liens or other interests he will be subrogated to the prior lien." *G.E. Capital Mortgage Servs., Inc. v. Levenson*, 338 Md. 227, 231–32, 657 A.2d 1170 (1995) (quoting

G.E. Osborne, *Handbook on the Law of Mortgages* § 277, at 561 (2d ed.1970)). The primary purpose of subrogation is to prevent unjust enrichment at the expense of another. *Id.* at 245, 657 A.2d 1170. In other words, equitable subrogation prevents the inequity of a party possessing a superior lien accepting payment from a third party without releasing its lien, thus enjoying the benefit of the payment while maintaining a superior lien priority to the payor.

SunTrust Bank argues that, although Maryland courts have not yet applied the doctrine of equitable subrogation to an open-ended line of credit, the majority view, as evidenced by citations to the decisions of several of our sister jurisdictions, disfavors subrogation absent authorization from the mortgagor to close the line of credit. Wachovia counters by noting that the cases cited by SunTrust Bank disfavor subrogation in the equity line of credit context because the unreleased line of credit is generally known to the subsequent lender. But Wachovia refers us to sister courts adopting the Restatement (Third) of Property, which posits that knowledge of intervening liens is irrelevant to the application of equitable subrogation.

The Restatement (Third) of Property provides, in pertinent part, that "[o]ne who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment." Restatement (Third) of Property § 7.6(a) (1997). Comment (e) to that section provides:

Most of the cases disqualify the payor who has actual knowledge of the intervening interest, although they do not consider constructive notice from the public records to impair the payor's right of subrogation. Under this Restatement, however, subrogation can be granted even if the payor had actual knowledge of the intervening interest; the payor's notice, actual or constructive, is not necessarily relevant. The question in such cases is whether the payor reasonably expected to get security with a priority equal to the mortgage being paid.

Although we recognize that there is some reasonableness to any subjective belief Wachovia may have had that, when it made its payment, it was obtaining a security with a priority equal to that of SunTrust Bank, we nevertheless have concluded, *supra*, that a sophisticated party such as Wachovia must make a more comprehensive inquiry when making such a payment to ensure the release of the lien at issue.

Thus, although we acknowledge the Restatement's approach as a means of preventing unjust enrichment, we note that in some cases, such as the one at bar, unjust enrichment might actually occur by implementing the Restatement approach. In that sense, we also acknowledge the merits of the majority approach. Had Wachovia obtained the Rezas' written authorization and forwarded it to SunTrust Bank along with its payment, there would have been no doubt that SunTrust Bank would have been required to release its lien. Instead, Wachovia left that critical issue to chance, and consequently, as we have noted, were it to be equitably subrogated to SunTrust Bank's position, SunTrust Bank would be unsecured for the six-figure debt the Rezas incurred subsequent to Wachovia's payment.

### III.

SunTrust Bank argues that Wachovia should be estopped from taking inconsistent positions in the same proceeding. In so arguing, SunTrust Bank refers to Wachovia's motions to intervene and receive the surplus from the sale in which Wachovia acknowledged SunTrust Bank's superior lien priority, only later to assert in its exceptions to the auditor's report that SunTrust Bank's lien priority was inferior to Wachovia's.

We need not dwell here long given our disposition of the previous two issues presented. We need only note that, although Wachovia's inconsistent pleadings are not dispositive because Wachovia corrected its position before the court issued a final judgment, they are further evidence of Wachovia's inattentiveness which, as we have held, precludes it from an equitable remedy.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REINSTATE, RATIFY, AND CONFIRM THE AUDITOR'S ORIGINAL AUDIT GRANTING SUNTRUST BANK FIRST LIEN PRIORITY AND THEREFORE COMPLETE SATISFACTION OF ITS FORECLOSED DEED OF TRUST, WITH WACHOVIA RECEIVING THE SURPLUS, IF ANY, PURSUANT TO THE CIRCUIT COURT'S JULY 13, 2007 AND AUGUST 17, 2007 ORDERS.

COSTS TO BE PAID BY APPELLEE.